| | |
|---|---|
| **DENVER DISTRICT COURT**<br>1437 Bannock Street<br>Denver, CO 80202 | DATE FILED: June 4, 2020 3:04 PM<br>FILING ID: 049137EG6583<br>▲COURT USE ONLY▲<br>CASE NUMBER: 2020CV31927 |
| **Plaintiff:  AGAZI ABAY, GABRIEL THORN, AMY SCHNEIDER, and MICHAEL McDANIEL** *On behalf of themselves and other similarly situated individuals*,<br><br>v.<br><br>**Defendant: CITY OF DENVER**.<br><br>**Attorney for Plaintiff**<br>Edward Milo Schwab, #47897<br>Ascend Counsel, LLC<br>3000 Lawrence Street<br>Denver, CO 80205<br>(303) 888-4407<br>milo@ascendcounsel.co | Case No.<br><br>Division: |
| **CLASS ACTION COMPLAINT AND DEMAND FOR A JURY TRIAL** | |

For their Complaint, Plaintiffs state and allege as follows:

## INTRODUCTION

The Denver Police cannot be trusted with the use of non-lethal weapons against protesters. For seven days, they have shown, across hundreds of incidents and just as many officers, that the use of these "less than lethal" ordinances is being done without regard to the constitutional rights of protesters and bystanders. The officers have, time and again, targeted journalists and ordinary citizens documenting their conduct, targeted medics seeking to give aide to those harmed by the use of these ordinances, failed to follow training or have not been trained on the use of these ordinances, and most upsettingly, these officers have simply used these weapons to assert and show their dominance over protesters and the citizens of Denver and

1

**EXHIBIT A**

Colorado. These actions have not been isolated events - rather, they are part of a force-wide use of excessive and unconstitutional force to restrict the constitutional rights of protesters challenging racism and police brutality in our society. This pattern and practice of conduct by Denver police tramples on the Constitution.

Plaintiffs bring this action to ask the Court to restrain the City of Denver from further violence and unconstitutional conduct.

## THE PARTIES

1. Plaintiff Agazi Abay is a Colorado resident who lives in the city and county of Denver.

2. Plaintiff Gabriel Thorn is a Colorado resident who lives in the city and county of Denver.

3. Plaintiff Amy Schenider is a Colorado resident who lives in the city and county of Denver.

4. Plaintiff Michael McDaniel is a Colorado resident who lives in the city and county of Denver.

5. Defendant City of Denver is a municipality incorporated in the State of Colorado.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the subject matter of this action pursuant to C.R.S. Const. art. VI,§ 9(1), and over the parties pursuant to C.R.S. § 13-1-124(1)(b) because this action arises from the commission of tortious acts within the State of Colorado, by residents of the State of Colorado.

7. Pursuant to C.R.C.P. 98(c), venue is proper in the District Court in and for the City and County of Denver because the conduct complained of occurred within the City and County of Denver.

2

## **BACKGROUND**

8.  On Monday, May 25, 2020, George Floyd was murdered by an officer of the Minneapolis Police Department ("MPD"). The events of Mr. Floyd's arrest and murder were captured on video by multiple bystanders as well as individual officers' body cameras. The videos depicted Mr. Floyd pinned on the street, face down and increasingly unresponsive, while MPD Officer Derek Chauvin knelt on Mr. Floyd's upper back and neck, two officers held him down, and another stood by. All four officers were soon fired by the MPD.

9.  Nationwide protests have erupted in response to this police brutality.

10. Denver's first protest occurred on Thursday, May 28, 2020.

11. Every night since and including May 28, 2020, peaceful protesters have assembled in downtown Denver, often on the steps of the Colorado State Capitol building. Although some protestors engaged in destructive activity (e.g., burning property and looting), these incidences have been remote when compared to the thousands of otherwise peaceful protesters.

12. Nonetheless, the Denver Police Department ("Denver Police" or "DPD"), and other police departments at their invitation, have engaged in injurious riot control tactics without issuing clear warnings and orders to disperse.

13. The Denver Police immediately turned to riot gear and riot tactics from the first day of protest.

14. One officer posted a picture on instagram of himself and two fellow officers stating: "Let's start a riot."



15. This officer was subsequently terminated. The Denver Police have taken no action against the other two officers.

16. But this officer was alone only in saying the quiet part out loud.

17. As Exhibit A shows, another DPD officer, when asked what was going to happen at 8:00 (the city enforced curfew), the officer responded: "What's going to happen is we're going to start beating the fuck out of you."

**See video of Denver Police officer threatening protester: www.ascendcounsel.co/exhibita**

18. The Police were there to counter the police brutality protests, and indeed were dressed and armed to use violence.

19. This mentality that the DPD was not there to serve a public safety role, but instead to dominate the protesters, is evident through talks with protesters, bystanders, press, and indeed, as captured on video.

20. In Exhibit B, we see a protester confronting a police officer. At some point, the police officer decides he has had enough of the protester's talking back and pepper sprays him to show who is in control.

**See video of Denver Police wantonly pepper spraying a protester:**

**www.ascendcounsel.co/exhibitb**

21. As the Exhibits below will show, such an incident was not isolated.

**See second video of Denver Police wantonly pepper spraying a protester:**

**www.ascendcounsel.co/exhibitc**

**See third video of police officers tearing up sign of peaceful protester and spraying without justification: www.ascendcounsel.co/exhibitd**

**See fourth video of line of officer spraying people without provocation:**

**www.ascendcounsel.co/exhibite**



22. What becomes clear in viewing these videos is that the Denver Police are not using pepper spray in a limited manner, but instead as a tool to suppress expression they don't appreciate.

23. Not only is the Denver Police using pepper spray to suppress expression, they are using it to deter documentation of their activity. In Exhibit F, we see a peaceful protester documenting a team of police in riot gear in broad daylight. When one of the officers notices the filmmaker, he takes action by targeting the filmmaker and shooting him with a pepper bullet.

**See video of Denver police officer punishing the mere act of documenting him in his riot gear. www.ascendcounsel.co/exhibitf**



**See second video of Denver police shooting at photographers:**

[**www.ascendcounsel.co/exhibitg**](http://www.ascendcounsel.co/exhibitg)

24. The Denver Police's attacks on those documenting the protests and the actions of the Denver Police was not limited to protesters. The Denver Police also targeted accredited journalists whose credentials were clearly visible.

**See photo of Denver Post reporter who was shot with pepper ball or rubber bullet**



25. The Denver Post reported on May 29, 2020 that photojournalist Hyoung Chang was

   struck twice Thursday night with pepper balls that cut his arm and shattered the press

   credential hanging around his neck. Chang said a Denver Police officer fired two pepper

   balls directly at him.

**See camera lens broken by police:**



26. *Denver Post* reporter Elise Schmelzer, who was wearing a reflective vest with the word

    "Press" on it, said Denver Police officers on Thursday fired at least one pepper ball at her

    feet.

27. On Friday May 29, 2020, a Denver7 reporter wrote on Twitter that a station

    photographer was hit four times by "paint balls" fired by Denver Police.

28.  On Saturday May 31, 2020, a 9NEWS reporter wrote on Twitter that state Capitol security officers fired "something" that hit his backpack "just after I went live with a large camera and light." The reporter was wearing a 9NEWS hat. He found a yellow-and-black projectile at the spot where he was hit.

29. On Saturday May 31, 2020, a reporter for Denverite wrote on Twitter: "Cops shoved me after I showed them my press credentials and forced me to inhale choking gas."

30. On Saturday May 31, 2020, a journalist wrote on Twitter that, while standing with photographers, an officer kicked a rolling chemical cannister "sideways right into us. Took it full in the face …"

31. On Sunday, another *Denver Post* reporter wrote on Twitter that he and a Denverite reporter, who was wearing a neon press vest, were ordered by an officer to move "toward an epic amount of tear gas … Cop points weapon right at us. We were forced back into the chaos and we both took a ton of gas to the face." A *New York Times* reporter posted a photo of a contusion the *Post* reporter suffered after being hit with a projectile: "He screamed "Press" shortly before being hit as officers fired on protesters."

32. The Denver Police also specifically targeted medics wearing red crosses attempting to provide care and treatment to those injured by the Police's wanton use of force.

**See video of protester being hit in the head and knocked out by a rubber bullet, and medics being shot at as they try to rescue him: www.ascendcounsel.co/exhibith**

33. Protester after protester have spoken out about seeing police target medics, especially medics while they attempt to administer care to people prone on the ground. As shown

below in the Megan Matthews news report, medics were also attacked while attempting

to render aide.

34. Not only were the Denver Police targeting protesters, press, and medics, they were and

continue to aim their ordinances at the heads and groins of individuals, in a clear tactic to

inflict maximum damage, pain, and distress to their target.

**See also news report of Megan Matthews who was hit in the eye with a rubber bullet:**

**https://kdvr.com/news/local/police-projectile-fractures-denver-protesters-face-she-says-it-w**

**as-unprovoked/?fbclid=IwAR1PDmRuiWVLGjXjkXlzaYODofgSH4dxMqPZIIg95uWn0-**

**RjvqCZBZq_bBs**



**See also news report of second person hit in the eye with a rubber bullet:**

**https://kdvr.com/news/local/local-man-needs-his-eye-removed-after-projectile-hits-his-face-**

[during-afternoon-protest-in-denver/?fbclid=IwAR2Q9RdYRmi3dp5GnuyOf6Tm6E-Noqu](during-afternoon-protest-in-denver/?fbclid=IwAR2Q9RdYRmi3dp5GnuyOf6Tm6E-Noqu)

[hzKTvHSknBTmUKLuZ-17UIc4YJkA](hzKTvHSknBTmUKLuZ-17UIc4YJkA)

**See also video of third person hit in the eye with a rubber bullet:**

[www.ascendcounsel.co/exhibiti](www.ascendcounsel.co/exhibiti)

**See also video of fourth person hit in the eye with a rubber bullet:**

[www.ascendcounsel.co/exhibitj](www.ascendcounsel.co/exhibitj)

35. The targeting of heads is a common feature of the Police's response to protesters, and Plaintiffs will attest to the fact that they saw and/or were targeted with rubber bullets.

36. This is not only excessive and malicious, it is also contrary to guidance on how rubber bullets are to be used. Proper use of 40 millimeter rubber bullets requires that they be aimed at the ground, not at the mass of a person's body. However, the City of Denver has failed to train the DPD on proper use of these ordinances before unleashing them on the City's civilians.

37. In addition to the improper use of these ordinances, general excessive force against protesters, press, and medics, the real story is that the DPD is not maintaining peace and public safety, but rather, is using force against peaceful protesters.

**See video of peaceful protesters chanting hands up don't shoot before being tear gassed and shot with pepper balls in broad daylight: [www.ascendcounsel.co/exhibitk](www.ascendcounsel.co/exhibitk)**

**See second video of police throwing teargas unprompted into a peaceful crowd:**

[www.ascendcounsel.co/exhibitl](www.ascendcounsel.co/exhibitl)

**See video of Denver Police casually throwing flashbangs into peaceful crowds:**

[www.ascendcounsel.co/exhibitm](www.ascendcounsel.co/exhibitm)

38. The Denver Police is and continues to use these weapons to send the message that they are to be feared, that they are there to dominate, and that they will use their weapons to silence any person they feel is not respecting their authority.

**See video of more than a dozen Denver officers shooting into a car in traffic with a pregnant woman inside: [www.ascendcounsel.co/exhibitn](www.ascendcounsel.co/exhibitn)**

**See video of Denver officers spraying pepper balls at a woman instead of asking her to move: [www.ascendcounsel.co/exhibito](www.ascendcounsel.co/exhibito)**

39. Unequivocally, the Denver Police cannot be trusted with these weapons. They use them without legitimate public safety goals, they use these weapons to prove a point, they use these weapons to silence criticism of the very practices that are being protested, they use these weapons with an intent to inflict maximum injury, and they use these weapons to dominate protesters, medics, and press. The Denver Police have proven, night after night, that they cannot be trusted to use these weapons.

## PLAINTIFF ALLEGATIONS

40. Plaintiff Agazi Abay is a resident of Denver and is a student and former social worker.

41. Mr. Abay attended protest rallies on Thursday, Friday, and Saturday.

42. On Thursday, Mr. Abay was tear gassed while marching. Later that evening, Mr. Abay was again tear gassed and shot at.

43. On Friday, Mr. Abay again joined the protest rally where he again observed peaceful protests. Over the course of the evening, more and more police arrived, lobbing tear gas and shooting at protesters. Mr. Abay observed people being tear gassed and shot at.

44. Mr. Abay attempted to help several people who had been severely tear gassed. While attempting to provide, Mr. Abay was targeted by police and further tear gassed. Mr. Abay, at no time, made and move or threat towards police. Their actions were provoked by his efforts to assist injured protesters.

45. During Mr. Abay's tear gassing on Friday evening, he began coughing. The tear gas was so thick and strong that he could not open his eyes. Mr. Abay struggled with these severe burning sensations and coughing for at least 15 minutes, and could not escape the continual bombardment of tear gas from the police.

46. Mr. Abay once more attended the protest rally on Saturday. He worked to stay away from the commotion to give himself a chance to heal from the previous two nights' attacks. But feeling guilty about the violence being done to other protesters, he ultimately decided to go back in to protest and assist those being injured.

47. That evening, one things Mr. Abay observed was the police in riot gearing, hanging off of vans, driving around shooting protesters. It was almost as if the police were playing a game of hide and seek, only when they found someone, the shot at them. Mr. Abay never observed the police give any oral commands.

48. Plaintiff Gabriel Thorn is a resident of Denver and is a public employee.

49. Mr. Thorn attended protest rallies on Friday and Sunday. While at the protests, Mr. Thorn served at times as a medic. Mr. Thorn is a verteran who served in the Armed Forces.

50. On Friday, Mr. Thorn observed a largely peaceful protest. He witnessed officers from the Denver Police Department utilize rubber bullets, tear gas, flashbang grenades, and pepper

balls. The protesters were attacked indiscriminately with these ordinances and without regard for safety.

51. Mr. Thorn also observed police officers aiming at bodies and heads when firing rubber bullets. Having served in the military and been trained to use rubber bullets, Mr. Thorn was struck that these officers had not been trained to use them correctly. His training in the military made clear that these bullets were to be aimed at the ground and never directly at people, even in war zones.

52. On Friday, Mr. Thorn was himself the victim of police violence. Mr. Thorn was struck with pepper balls, rubber bullets, and was tear gassed multiple times. When Mr. Thorn was struck with rubber bullets, as with many others, he was struck in the head. Fortunately, he was wearing a helmet at that time.

53. Mr. Thorn also wore a red cross on his helmet and backpack to indicate that he was a medic there to treat those injured. Several times while treating injured people, police officers targeted him and shot pepper balls.

54. Mr. Thorn also observed unprovoked drivebys around 6:00 pm whereby police officers would drive by in cruisers shooting protesters with pepper balls from the car windows.

55. Plaintiff Amy Schneider is a resident of Denver and works as a union organizer.

56. Ms. Schneider attended protest rallies on the evening of Saturday, Sunday, and Monday.

57. On Saturday afternoon, Ms. Schneider, while peacefully protesting, was struck with tear gas, leaving her with burning eyes and throat. She could not breathe for several minutes and believed she was dying.

58. On Sunday evening, Ms. Schneider was again peacefully protesting when Denver police officers aimed and shot flashbang grenades at Ms. Schneider's head.

59. On Monday evening, Ms. Schneider was once again peacefully protesting when Denver police officers surrounded her and fellow protesters. Many protesters were teargassed, but Ms. Schneider was thankfully not at this point and attempted to provide aide to those in pain.

60. Ms. Schneider heard that medics were being targeted by the Denver police.

61. Ms. Schneider quickly again found herself surrounded by Denver police, and which point they began shooting her with pepper bullets. The Police never made any demand and continued to shoot protesters who kept their hands up in the air.

62. The protesters begged the cops to be allowed to go home, but the police continued to shoot.

63. Soon thereafter, Ms. Schneider was tackled by a police officer, without resisting.

64. She was then arrested and placed in a windowless van with other protesters. When one of the protesters who had been gassed began having an asthma attacked, the protesters begged the police officers to call for medical attention. Instead the police officers laughed and said: "if you wanted to breathe, you should have stayed home tonight."

65. Plaintiff Michael McDaniel is a resident of Denver.

66. Mr. McDaniel attended the protest rally on Saturday afternoon to serve as a medic to attend to those injured by the police.

67. At one point, the Police excessive tear gassed a parking lot on the corner of Colfax and Lincoln. The tear gas was so thick, that it was a cloud that could not be seen through.

68. Mr. McDaniel saw a protester crawling out on his hands and knees. The protester was choking and could not breathe.

69. Mr. McDaniel, with his back to the police, kneeled down to treat the protester, who was still on all fours.

70. The police then proceeded to target and shoot Mr. McDaniel and the protester with pepper bullets.

71. Thankfully, Mr. McDaniel was wearing a helmet, so when the police aimed at his head, they did not cause any injury, other than the intense burning pain that Mr. McDaniel experienced as a result of the pepper balls.

## MUNICIPAL ALLEGATIONS

72. The City of Denver has policies and customs of violating the freedom of expression of protesters and of using excessive force against such protesters.

73. The City of Denver has a custom or policy of deploying chemical agents and injurious, less-lethal ballistics against protesters without provocation. Denver has a custom or practice of targeting press, of targeting medics, and of using force for no reason other than to show its dominance.

74. The City of Denver has failed to train its police officers on the use of chemical agents and less-lethal ballistics. This is shown in part by the fact that officers are aiming rubber bullets at peoples' heads and groins when proper training would instruct that this should never be done. Rubber bullets are to be aimed at the ground. Nonetheless, the police continue to target heads, leading to many head and eye injuries.

75. The City of Denver has a custom or practice of targeting press and those recording police actions. The City of Denver entered into a settlement after arresting a reporter in 2018 for simply documenting police conduct.[1] The police have either not been trained under this settlement, or have a custom of disregarding their duties under it. Journalists continue to be targeted[2] and protesters are attacked for recording police abuse.

76. The City of Denver has a custom or practice of failing to provide warning and/or dispersal orders before using chemical agents and injurious, less-lethal ballistics against protesters, medics, and members of the media.

77. The City of Denver has a custom or practice of infringing on peoples' right to assemble, to protest, to express their political and other beliefs, and on the basis of their viewpoint.

## CLASS ALLEGATIONS

78. Under Rules 23(a) and 23(b)(1) and (2) of the Colorado Rules of Civil Procedure, Plaintiffs bring this action for prospective relief on behalf of themselves and other similarly situated people who, as protesters, medics, journalists, and citizens of the State of Colorado, will in the future observe, record, and participate in protest activity and in public places within the city Denver in traditional or designated public fora (the "Plaintiff Class"). The Plaintiff Class is defined as:

---

[1]
https://www.coloradoindependent.com/2019/09/10/denver-police-agree-to-first-amendment-training-in-settlement-with-indy-editor-they-wrongfully-detained/
[2]
https://www.coloradoindependent.com/2020/06/01/denver-floyd-protests-law-enforcement-targeting-reporters-photographers/

All protesters, who intend to engage in protest activities, to render aide to those who have been injured, and to record the actions of police officer on duty in public places within the city and county of Denver.

79. The Plaintiff Class is so numerous that joinder of all the members would be impracticable. Denver protest events over the past week often number in excess of 10,000 participants.

80. As a result of the Denver's customs and policies of targeting journalist, medics, and protesters with less-lethal projectiles and chemical irritants without constitutionally adequate justification or warning, with excessive force, denying them freedom of movement to observe, record, and participate in public demonstrations, intimidation by threats of violence, and ad infringement on their right to assemble and speak, the Plaintiff Class have been and will continue to be deprived of their constitutional rights under the First, Fourth, and Fourteenth Amendments.

81. Plaintiffs' claims for prospective relief are typical of the members of the Plaintiff Class because Protests are ongoing and Plaintiffs and the Plaintiff Class members have a reasonable fear that Defendants will continue to carry out their unconstitutional customs or policies of deploying less-lethal projectiles and chemical irritants without constitutionally adequate warning, with excessive force, denying them freedom of movement to observe, participate, and record public demonstrations, intimidation by threats of violence, and infringement on their right to assemble and speak.

82. Plaintiffs will fairly and adequately protect the interests the interests of the Plaintiff Class. Plaintiffs has no conflicts involving other class members or Defendant. Plaintiffs

understand their role as a class representative and their duties to the class in this litigation. Plaintiffs are represented by competent and skilled counsel whose interests are fully aligned with the interests of the class.

83. Questions of law or fact are common to the class. These legal and factual questions include but are not limited to:

    a.  Does the use of less-lethal weapons, as deployed by the Denver Police, infringe on protester's constitutional right to be free of excessive force under the Fourth Amendment?

    b.  Does the use of less-lethal weapons, as deployed by the Denver Police, infringe on protester's constitutional right to peaceable assemble and their right to freedom of expression and from view-point discrimination under the First Amendment?

    c.  Has the City of Denver manifested a failure to adequately train and supervise its officers to utilize these weapons?

    d.  Has the City of Denver exhibited deliberate indifference to the unconstitutional conduct complained herein?

84. Maintaining individual actions would create a risk of "inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." C.R.C.P. 23(b)(1)(A). Multiple courts issuing multiple injunctions governing the engagement and use-of-force standards for law enforcement would be entirely untenable. Doing so would only contribute to a state of uncertainty and confusion that allows the constitutional violations described in the complaint to continue.

85. This case involves "adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications." C.R.C.P. 23(b)(1)(A). A ruling with respect to a single Plaintiffs in this case would arguably be strong stare decisis—if not necessarily res judicata—with respect to other putative class members and members of the law enforcement community. There is no benefit to allowing the overwhelmingly common issues in this case to be litigated individually. The interests of both class members and defendants requires classwide treatment.

86. Finally, "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" C.R.C.P. 23(b)(1)(A). There is no allegation that Plaintiffs have been targeted because of anything unique to them as individuals. Rather, they have been repeatedly targeted and assaulted because of their membership in a class protesters and medics. Plaintiffs' targeting exists only by virtue of a broader pattern and practice of unconstitutional conduct directed at journalists, medics, and protesters as a class. Logically, injunctive relief for the "class as a whole" is the only mechanism available to afford relief in light of conduct directed specifically to the class.

**CAUSES OF ACTION**

**COUNT I:**

Fourth Amendment - Excessive Force, 42 U.S.C. 1983

87. Plaintiffs and the Plaintiff Class restate and reallege all previous paragraphs of this Complaint.

88. Plaintiff and the Plaintiff Class were seized by Defendant when its officers intentionally, through the use of force and threat of arrest, chemical agents, and nonlethal projectiles, terminated their freedom of movement.

89. Defendant committed these acts without forewarning and, as a result, Defendant's acts were objectively unreasonable and constituted unlawful seizure and excessive force.

90. Plaintiffs and the Plaintiff Class did not commit a crime.

91. Plaintiffs and the Plaintiff class did not pose a threat to any of Defendant's officers or agents or any other person.

92. It was Denver's custom and policy, as well as their failure to train and supervise their officers, and issue corrective instructions after violations were brought to light, that caused the unlawful seizures and excessive use of force.

93. Denver's failure to supervise and train their employees and agents with respect to the Fourth Amendment rights of Plaintiffs and the Plaintiff Class, including a failure to investigate and discipline officers for Fourth Amendment violations, amounts to deliberate indifference to the rights of Plaintiffs and the Plaintiff Class.

94.  The pattern of similar constitutional violations against Plaintiffs and the Plaintiff Class that occurred during the protests demonstrates the deliberate indifference of Denver to the rights of Plaintiffs and the Plaintiff Class.

95. Further, given the pattern and practice of constitutional violations documented above, the need for more supervision or training was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that Denver demonstrated their deliberate indifference to the need for such training and supervision.

96. Plaintiffs' Fourth Amendment rights were violated when they were deliberately targeted and shot with rubber bullets, tear gas, pepper balls, flashbang grenades, and pepper spray during the course of their lawful protests.

97. Plaintiffs and the Plaintiff Class reasonably fear further retaliation in the future in violation of the Fourth Amendment if they continue to observe, record, or participate in constitutionally protected activity.

## COUNT II:

### First Amendment - 42 U.S.C. 1983

98. Plaintiffs and the Plaintiff Class restate and reallege all previous paragraphs of this Complaint.

99. Plaintiffs and the Plaintiff Class engaged in constitutionally protected acts of observing, recording, and participating in events of public interest, including public demonstrations and in expressing their political views. Plaintiffs and the Plaintiff Class will continue to do so in the future.

100.    Defendant retaliated against Plaintiffs and the Plaintiff Class for engaging in constitutionally protected activity and for the content and viewpoint of the expressions. Defendant's retaliation is part of a pattern or practice of unconstitutional conduct that is certain to continue absent any relief.

101.    Plaintiffs and the Plaintiff Class reasonably fear the continued deployment of chemical agents without warning, unlawful seizure, and excessive force through the firing of flash bang grenades, less-lethal projectiles, riot batons, and other means if they continue to engage in constitutionally protected activity.

102.    These acts would chill a reasonable person from continuing to engage in a

constitutionally protected activity. These acts did, in fact, chill Plaintiffs and the Plaintiff

Class from continuing to observe and record some events of public interest and to

participate in peaceful protests.

103.    It was Defendant's custom and policy, as well as their failure to train and supervise

their officers, and issue corrective instructions after violations were brought to light, that

caused the First Amendment retaliation.

104.    Defendant's failure to supervise and train their employees and agents with respect to

the First Amendment rights of Plaintiff and the Plaintiff Class, amounts to deliberate

indifference to the rights of Plaintiff and the Plaintiff Class.

105.    The pattern of similar constitutional violations against Plaintiffs and the Plaintiff

Class that occurred during the protests demonstrates the deliberate indifference of the

Defendant to the rights of Plaintiffs and the Plaintiff Class.

106.    Further, given the multiple constitutional violations documented above, the need for

more supervision or training was so obvious, and the inadequacy of the training and

supervision so likely to result in the violation of constitutional rights, that Defendant

demonstrated their deliberate indifference to the need for such training and supervision.

107.    Plaintiffs' First Amendment rights were violated when they was deliberately targeted

and shot with rubber bullets, tear gas, pepper spray, pepper balls, and flashbang grenades

during the course of their protest activities.

108.    Plaintiffs and the Plaintiff Class reasonably fear further retaliation in the future if they

continue to observe, record, or participate in constitutionally protected activity.

WHEREFORE, Plaintiffs, individually and as representatives of the class defined here, pray for relief as follows:

1. A temporary restraining order barring the City of Denver from the use of tear gas, rubber bullets, pepper balls, pepper spray, and flashbangs.

2. A preliminary injunction barring Defendants from engaging in unconstitutional conduct

3. A determination that this action may proceed as a class action under Rule 23(b)(1) or 23(b)(2) of the Colorado Rules of Civil Procedure;

4. Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as class counsel;

5. A declaration that Defendant's conduct violated the First and Fourth Amendments of the United States Constitution.

6. A permanent injunction barring Defendants from engaging in unconstitutional

7. Damages compensating Plaintiffs for their injuries, including but not limited to compensatory, pecuniary, and medical expense damages;

8. An award of prejudgment interest;

9. An award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

10. An award of such other and further relief as the Court deems equitable and just.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues triable.

Respectfully submitted this 4th day of June, 2020.

s/ Edward Milo Schwab
Edward Milo Schwab, #47897
Ascend Counsel, LLC
3000 Lawrence Street
Denver, CO 80205
(303) 888-4408
milo@ascendcounsel.co

**ATTORNEY FOR PLAINTIFFS**