## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-1616

AGAZI ABAY,
GABRIEL THORN,
AMY SCHNEIDER, and
MICHAEL McDANIEL,
on behalf of themselves and other similarly situated individuals,

Plaintiffs,

v.

CITY AND COUNTY OF DENVER
      Defendant.

---

## MOTION FOR EMERGENCY TEMPORARY RESTRAINING ORDER AND FOR COURT TO SCHEDULE A HEARING ON JUNE 05, 2020

---

Plaintiffs Agazi Abay, Gabriel Thorn, Amy Schneider, and Michael McDaniel, on behalf of themselves and a class of individuals similarly situated ("Class Members"), hereby move for a temporary restraining order ("TRO"). This motion is based on Fed. R. Civ. P. 65, 42 U.S.C. § 1983, and the First and Fourth Amendments to the United States Constitution.

Plaintiffs specifically seek an order enjoining Defendants and their agents, servants, employees, and representatives from:

    a. The use of chemical agents including but not limited to mace/oleoresin capsicum spray or mist/pepper spray/pepper gas, tear gas, skunk, inert smoke, pepper pellets, xylyl bromide, and similar substances, where a person is engaged in demonstration activities,

documentation of the demonstration and police activities, or the treatment of injured demonstrators; and

b. The use of physical force including through the use of flash bang grenades, non-lethal projectiles, riot batons, or any other means, where an individual is engaged in demonstration activities, documentation of the demonstration and police activities, or the treatment of injured demonstrators.

## CONFERRAL

Plaintiffs conferred over the phone with counsel for Defendant and informed them that they would be requesting the relief sought.  Defendant did not indicate whether they oppose the relief sought herein, but Plaintiffs assume that Defendant opposes such relief.

## INTRODUCTION

Plaintiffs Agazi Abay, Gabriel Thorn, Amy Schneider, and Michael McDaniel bring this class-action lawsuit on behalf of themselves and similarly situated demonstrators and citizens of Denver whose constitutional rights have been, and continue to be, violated by the Denver Police Department who use pepper spray, rubber bullets, pepper balls, flashbang grenades, and tear gas to punish Plaintiffs, and those similarly situated, for the temerity to challenge the very police brutality which the Denver Police continue to inflict.  The Police are inflicting irreparable injury on the citizens of Denver, with injuries including but not limited to loss of vision, fractured bones requiring surgery, deep lacerations, loss of eyes, ruptured testicles, and failure to train on the use, of these militaristic weapons.

Defendant has demonstrated a pattern and practice of violating the Constitutional rights of demonstrators to assemble and to express their views through the use of excessive force.  Over the past eight nights, Denver police have targeted journalists and medics and have retaliated against

demonstrators for engaging in demonstrations, and sometimes for expressing anti-law enforcement viewpoints. What is more, the Denver Police have not been trained properly and are not properly administering the weapons they are using; the predictable result is that Denver police are inflicting injury and harm beyond the intent of these weapons. More troubling, Denver police show a deliberate indifference for the safety of demonstrators, using their weapons to retaliate for lack of respect and to intimidate demonstrators. Perhaps worst of all, Denver Police are intentionally aiming their projectiles at demonstrators' heads and groins, seeking to inflict maximum pain and physical injury.

Defendant has and continues to inflict excessive force, without provocation, and this police brutality must be restrained immediately. Plaintiffs request that this court set a hearing on the merits of this Motion for a Temporary Restraining Order for Friday June 5, 2020. With the Denver police targeting demonstrators' heads, another weekend will surely lead to more eyes lost, more broken bones and an increased risk that Defendant's escalation of brutality will result in the death or permanent physical impairment of a peaceful demonstrator.

## FACTUAL BACKGROUND

On Monday, May 25, 2020, Officer Derek Chauvin, an officer of the Minneapolis Police Department ("MPD"), held his knee on the neck of a handcuffed George Floyd for eight minutes and 46 seconds, including two minutes and 53 seconds of which Floyd was non-responsive. Three other MPD officers stood by watching while bystanders screamed for Officer Chauvin to stop. This police brutality resulted in the death of George Floyd. The events leading to Mr. Floyd's death were captured on video by multiple bystanders as well as officers' body cameras. All four officers were soon terminated by the MPD, and all four face criminal charges related to Mr. Floyd's death. Nationwide demonstrations have erupted in response to this police brutality.

Denver's first demonstration occurred on Thursday, May 28, 2020.  On that night and every night since, peaceful demonstrators have assembled in downtown Denver, often on the steps of the Colorado State Capitol building. Although some demonstrators engaged in destructive activity (e.g., burning property and looting), these incidents have been remote when compared to the thousands of otherwise peaceful demonstrators. Nonetheless, the Denver Police Department ("Denver Police" or "DPD"), and other police departments at their invitation, have engaged in injurious riot control tactics without issuing clear warnings or orders to disperse.

The Denver Police immediately turned to riot gear and riot tactics from the first day of demonstrations. One officer posted a picture on Instagram of himself and two fellow officers stating: "Let's start a riot."



While DPD has suggested that this is just one bad apple, in reality, it was really just a new officer who did not know that he wasn't supposed to speak aloud the unspoken truth.  Denver

Police have instead told protesters that "we're going to start beating the fuck out of you" when curfew starts.

**See video of Denver Police officer threatening protester: www.ascendcounsel.co/exhibita**

The police have not been present to protect the community, but instead they were there to counter the demonstrations and indeed were dressed and armed to use violence.  This mentality that the DPD was not present to serve a public safety role, but instead to dominate the demonstrations and demonstrators, is evident through talks with demonstrators, bystanders, press, and as captured on video.  In Exhibit B linked below, we see a citizen confronting a police officer. At some point, the police officer decides he has had enough of the demonstrator's speech and pepper sprays him to show who is in control.

**See video of Denver Police wantonly pepper-spraying a demonstrator: www.ascendcounsel.co/exhibitb**

**See second video of Denver Police wantonly pepper-spraying a protester: www.ascendcounsel.co/exhibitc**

**See third video of police officers tearing up the sign of peaceful demonstrator and spraying without justification: www.ascendcounsel.co/exhibitd**

**See fourth video of line of officer spraying people without provocation: www.ascendcounsel.co/exhibite**

What becomes clear in viewing these videos is that the Denver Police are not using pepper spray in a limited manner, but instead as a tool to suppress unwanted speech.  Not only are the Denver police using pepper spray to suppress speech, but they are also using it to deter documentation of their activities.  In Exhibit F linked below, we see a peaceful demonstrator

documenting a team of police in riot gear in broad daylight.  When one of the officers notices the filmmaker, he takes action by targeting the filmmaker and shooting him with a pepper bullet.

**See video of Denver police officer punishing the mere act of documenting him in his riot gear: www.ascendcounsel.co/exhibitf**

**See second video of Denver police shooting at photographers:**

**www.ascendcounsel.co/exhibitg**

Defendant's attacks on those documenting the demonstrations and the actions of the Denver Police were not limited to demonstrators.  The Denver Police also targeted accredited journalists whose credentials were clearly visible.  The Denver Post reported on May 29, 2020, that photojournalist Hyoung Chang was struck twice Thursday night with pepper balls that cut his arm and shattered the press credential hanging around his neck.  Chang said a Denver Police officer fired two pepper balls directly at him.

Denver Post  reporter Elise Schmelzer, who was wearing a reflective vest with the word "Press" on it, said Denver Police officers on Thursday fired at least one pepper ball at her feet.  On Friday, May 29, 2020, a Denver7 reporter wrote on Twitter that a station photographer was hit four times by "paintballs" fired by Denver Police.  On Saturday, May 31, 2020, a 9NEWS reporter wrote on Twitter that state Capitol security officers fired "something" that hit his backpack "just after I went live with a large camera and light."  The reporter was wearing a 9NEWS hat.  He found a yellow-and-black projectile at the spot where he was hit.  On Saturday May 31, 2020, a reporter for Denverite wrote on Twitter: "Cops shoved me after I showed them my press credentials and forced me to inhale choking gas."

On Saturday May 31, 2020, a journalist wrote on Twitter that, while standing with photographers, an officer kicked a rolling chemical cannister "sideways right into us.  Took it full

in the face . . . ." On Sunday, another Denver Post reporter wrote on Twitter that he and a Denverite reporter, who was wearing a *neon* press vest, were ordered by an officer to move "toward an epic amount of tear gas . . . .  Cop points weapon right at us.  We were forced back into the chaos and we both took a ton of gas to the face."  A New York Times  reporter posted a photo of a contusion the Post reporter suffered after being hit with a projectile: "He screamed 'Press' shortly before being hit as officers fired on protesters."





Not surprisingly, the Denver Police have not limited their retaliatory targeting to journalists. The police have shown a complete hostility toward those seeking to provide treatment and aid to demonstrators injured by Denver's police misconduct and abuse. The Denver Police have specifically targeted medics wearing red crosses and others attempting to provide care and treatment to those injured by DPD's wanton use of force. They shoot pepper balls and throw tear gas to retaliate against medics with an end result of effecting further harm to those who dare to challenge police abuse.

**See video of demonstrator being hit in the head and knocked out by a rubber bullet, and medics being shot at as they try to rescue him: www.ascendcounsel.co/exhibith**

Demonstrator after demonstrators has spoken out about seeing police target medics, especially medics while they attempt to administer care to people prone on the ground.  As shown below in the Megan Matthews news report, medics were also attacked while attempting to render aid.  Not only were the Denver Police targeting demonstrators, press, and medics, they were and continue to aim their munitions at the heads and groins of individuals, in a clear tactic to inflict maximum damage, pain, and distress to their target.

**See also news report of Megan Matthews who was hit in the eye with a rubber bullet:**

**https://kdvr.com/news/local/police-projectile-fractures-denver-protesters-face-she-says-it-was-**

**unprovoked/?fbclid=IwAR1PDmRuiWVLGjXjkXlzaYODofgSH4dxMqPZIIg95uWn0-RjvqCZBZq_bBs**



**See also news report of second person hit in the eye with a rubber bullet:**

**https://kdvr.com/news/local/local-man-needs-his-eye-removed-after-projectile-hits-his-face-**

[11during-afternoon-protest-in-denver/?fbclid=IwAR2Q9RdYRmi3dp5GnuyOf6Tm6E-NoquhzKTvHSknBTmUKLuZ-17UIc4YJkA](#)

**See also video of third person hit in the eye with a rubber bullet:**

[www.ascendcounsel.co/exhibiti](#)

**See also video of fourth person hit in the eye with a rubber bullet:**

[www.ascendcounsel.co/exhibitj](#)

And yet on the very night that Denver was preparing its notice of removal, another individual was struck in the face with a rubber bullet.

The targeting of heads is a common feature of DPD's response to demonstrators, and Plaintiffs will attest to the fact that they saw and/or were targeted with rubber bullets. This is not only excessive and malicious, it is also contrary to guidance on how rubber bullets are to be used. Proper use of 40 millimeter rubber bullets requires that they be aimed at the ground, not at the mass of a person's body. However, the City of Denver has failed to train the DPD on proper use of these ordinances before unleashing them on the City's civilians. In addition to the improper use of these ballistics, general excessive force against demonstrators, press, and medics, the real story is that the DPD is not maintaining peace and public safety, but rather, is using force against peaceful demonstrators.

**See video of peaceful demonstrators chanting hands up don't shoot before being tear gassed and shot with pepper balls in broad daylight: [www.ascendcounsel.co/exhibitk](#)**

**See second video of police throwing teargas unprompted into a peaceful crowd:**

[www.ascendcounsel.co/exhibitl](#)

**See video of Denver Police casually throwing flashbangs into peaceful crowds:**

[www.ascendcounsel.co/exhibitm](#)

The Denver Police continue to use these weapons to send the message that they are to be feared, that they are there to dominate, and that they will use their weapons to silence any person they feel is not respecting their authority.

**See video of more than a dozen Denver officers shooting into a car in traffic with a pregnant woman inside: www.ascendcounsel.co/exhibitn**

**See video of Denver officers spraying pepper balls at a woman instead of asking her to move: www.ascendcounsel.co/exhibito**

Unequivocally, the Denver Police cannot be trusted with these weapons.  They use them without legitimate public safety goals, they use these weapons to prove a point, they use these weapons to silence criticism of the very practices that are being challenged, they use these weapons with an intent to inflict maximum injury, and they use these weapons to dominate demonstrators, medics, and press.  The Denver Police have proven, night after night, that they cannot be trusted to use these weapons.

**Named Plaintiffs**

Plaintiffs Agazi Abay, Gabriel Thorn, Amy Schneider, and Michael McDaniel are four residents of Denver who have participated in various roles in the demonstrations.  As with countless others, Plaintiffs have been subjected to intimidation, retaliation, and police brutality as part of the Denver Police Department's efforts to stomp out anti-police expression and to inflict excessive force on those who dare to demonstrate.

Mr. Abay attended demonstrations on Thursday, Friday, and Saturday as a demonstrator and to assist with providing medical aid to those injured by police force.  At various times throughout each of these demonstrations, Mr. Abay was tear gassed, at one point nearly losing consciousness.  Mr. Abay never made a threat, or even moved towards, police prior to being

attacked.   At one point, Denver police targeted him with tear gas as he tended to an injured demonstrator.   At other times during the demonstrations, Mr. Abay was shot with pepper bullets, including from officers driving by shooting demonstrators without regard for safety and without warning.

Mr. Thorn is a veteran of the armed forces and attended protests on Friday and Sunday to serve as a medic, wearing a red cross, for those injured by the police.   In the course of time at the protests, Mr. Thorn witnessed only peaceful demonstrations which were met with indiscriminate and retaliatory use of force by Denver police officers.   Mr. Thorn saw Denver officers use rubber bullets, tear gas, flashbang grenades, and pepper bullets on demonstrators and medics.   Mr. Thorn also observed Denver police officers aiming rubber bullets at people's heads.   In fact, Mr. Thorn was struck in the head himself by a rubber bullet.   This manner of use of these weapons was especially troubling because Mr. Thorn was trained to use these same weapons in the military where soldiers are instructed that they should never aim directly at people's faces or upper bodies, and instead should aim at the ground.   Mr. Thorn was also subjected to indiscriminate tear gassing and being shot by pepper bullets throughout the two days he attended demonstrations.

Ms. Schneider attended protest rallies on Saturday, Sunday, and Monday.   Over the course of her experience, Ms. Schneider was tear gassed and had an officer fire a flashbang grenade at her head.   On Monday evening, Ms. Scheider was pelted with pepper balls and was tackled to the ground in the course of the Denver police arresting her.   While sitting in the police van, another arrestee was having an asthma attack, having been tear gassed just prior to his arrest.   When Ms. Schneider and the other protesters pleaded with the police to get this man medical attention, the police replied that "if you wanted to breathe, you should have stayed home tonight."

Mr. McDaniel attended the rally on Saturday to serve solely as a medic for those injured by the police use of chemical agents and rubber and pepper bullets.  At one point, Mr. McDaniel saw a man crawling out of a large cloud of tear gas.  The man could barely breathe and was on all fours.  With his back to the police, Mr. McDaniel went to provide saline and other care to the injured demonstrator.  At this point, the police started targeting Mr. McDaniel with pepper bullets, hitting his helmet and causing him and the injured protester to seek safe cover.  Mr. McDaniel suffered eye and throat pain as a result of Denver police's retaliation for his aiding an injured demonstrator.

## LEGAL ARGUMENT

### I. Legal Standard.

In determining whether to grant a TRO, the court must analyze the following factors: a substantial likelihood of success on the merits (2) irreparable harm will ensue if the request for a TRO is denied; (3) the threatened injury outweighs the harm that the TRO may cause the defendant; and, (4) if issued, the TRO will not adversely affect the public interest.  *General Motors Corp. v. Urban Gorilla, LLC,* 500 F.3d 1222, 1226 (10th Cir. 2007).

F.R.C.P. 65(b)(1) imposes requirements for the ex parte imposition of a temporary restraining order.  It states:

> The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:

> (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

> (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

**II. Likelihood of Success on the Merits**

A. <u>Plaintiffs are Likely to Succeed on the Merits</u>

Plaintiffs and the claims of other, similarly situated individuals ("Class Members"), alleging violations of the First, Fourth, and Fourteenth Amendments, are likely to succeed on the merits. In cases in which the deprivation of constitutional rights is at issue, the likelihood of the success on the merits factor is determinative. *See Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (quoting *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012), *cert. denied*, --- U.S. ---, 133 S. Ct. 651 (2012)) ("[I]n First Amendment cases, the likelihood of success on the merits will often be the determinative factor."); *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 805–06 (10th Cir. 2019) (concluding that "[a]ny deprivation of any constitutional right" will make "an injury 'irreparable'"); *Herrera v. Santa Fe Pub. Schs.*, 792 F. Supp. 2d 1174, 1182 (D.N.M. 2011) (citing *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976)) (concluding that after determining the likelihood of Fourth Amendment violation, that violation "standing alone" constituted irreparable injury). This factor is determinative because "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003) (internal quotation marks omitted), and "it is always in the public interest to prevent the violation of a party's constitutional rights," [*Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012).]" *Hobby Lobby*, 723 F.3d at 1145. And that same logic applies to "[a]ny deprivation of any constitutional right." *Free the Nipple-Fort Collins*, 916 F.3d at 806.

1. *Plaintiffs Have Shown a Significant Likelihood of Success on their Fourth Amendment Claims*

The Fourth Amendment guarantees the right to be free from excessive force.  Claims of excessive force are analyzed under the objective reasonableness standard of the Fourth Amendment.  *Graham v. Connor,* 490 U.S. 386, 395 (1989).  The reasonableness of an officer's conduct must be assessed "from the perspective of a reasonable officer on the scene," recognizing the fact that the officer may be "forced to make split-second judgments" under stressful and dangerous conditions.  *Id.* at 396–97.  The Fourth Amendment standard requires inquiry into the factual circumstances of every case; relevant factors include the crime's severity, the potential threat posed by the suspect to the officer's and others' safety, and the suspect's attempts to resist or evade arrest.  *Id.* at 396–97.

Here, the videos lay bare the unreasonableness of Defendant's conduct.  The videos do not show split-second judgments, but instead responses after ample time for reflection.  The police in these videos are not responding to some public safety need, but instead acting with the intention of inflicting pain and harm, if for no other reason than the fact they can or because they do not like the fact or subject matter of the protests.  Named Plaintiffs have experienced targeted attacks by Denver police officers solely on the basis of (1) their presence at the demonstrations; (2) their viewpoint and/or (3) when attempting to render treatment and aid to injured protesters.  Additionally, as with many other demonstrators, journalists, and aid providers, Plaintiffs have been subject to indiscriminate barrages of rubber and pepper bullets, tear gas, and other chemical agents.  Denver Police are not only using excessive force with deliberate indifference to risk of injury, but in many cases they appear to be intentionally seeking to cause injury.  Specifically, officers are aiming ballistics at people's heads and groins.  People have had their facial bones broken,

shattered.  Citizens have ruptured testicles.  And scores of demonstrators have been struck with ballistics and chemical agents for no other reason than the police decided to use far more excessive force than necessary, if any was appropriate in the first place.

2.  *Plaintiffs Have Shown a Significant Likelihood of Success on their Claim for Violations of Their First Amendment Rights*

Plaintiffs and those similarly situated to them have an established constitutional right to participate in and document demonstration activities.  The "principal function of free speech under our system of government is to invite dispute.  It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger."  *Texas v. Johnson*, 491 U.S. 397, 408–09 (1989) (citation and quotation marks omitted).  Organized political protest is a form of "classically political speech."  *Boos v. Barry*, 485 U.S. 312, 318 (1988).  The First Amendment "reflects a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and [we] have consistently commented on the central importance of protecting speech on public issues.  *Id.* (internal citations omitted) (collecting cases).  "This has led us to scrutinize carefully any restrictions on public issue picketing."  *Id.* (citations omitted).

Further, all citizens have a right to hold and express their personal political beliefs.  *See Cohen v. California*, 403 U.S. 15, 24 (1971) ("The constitutional right of free expression is powerful medicine in a society as diverse and populous as ours. It is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity and in the belief that no other approach would comport with the premise of individual dignity and choice upon which our

political system rests.") Indeed, "the First Amendment safeguards an individual's right to participate in the public debate through political expression and political association." *McCutcheon v. Fed. Election Com'n*, 572 U.S. 185, 203 (2014).

Additionally, the Supreme Court "has repeatedly held that police may not interfere with orderly, nonviolent protests merely because they disagree with the content of the speech or because they simply fear possible disorder." *Jones v. Parmley*, 465 F.3d 46, 56 (2d Cir. 2006) (citing *Cox v. Louisiana,* 379 U.S. 536, 550 (1965) ( *"Cox I"* ); *Edwards v. South Carolina*, 372 U.S. 229, 237 (1963) (political protest speech is protected even though it invites dispute and may stir people to anger). Further, "it has long been clearly established that the First Amendment bars retaliation for protected speech and association." *Buck v. City of Albuquerque*, 549 F.3d 1269, 1292 (10th Cir. 2008) (quoting *Mimics, Inc. v. Village of Angel Fire*, 394 F.3d 836, 848 (10th Cir. 2005)). The Tenth Circuit examines "First Amendment retaliation claims under *Worrell v. Henry*, 219 F.3d 1197 (10th Cir. 2000)[,]" which requires inquiry into whether (1) plaintiffs were engaged in constitutionally protected activity; (2) whether defendants caused the plaintiffs to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) whether defendant's actions were motivated by plaintiffs' protected activity. *Id.*

There is no question that Defendant's use of excessive force to chill and outright prevent Plaintiffs from demonstrating or documenting such is a violation of their First Amendment rights. From the evidence produced above as well as the proof that will be presented during the requested hearing, we can see that police officers are using physical weapons and chemical agents to prevent demonstrators from speaking and participating, journalists from documenting, and third parties from offering aid to those in need. These injuries undoubtedly would chill a person of ordinary fitness from continuing to engage in such constitutionally-protected demonstrations. In engaging

in conduct that directly interferes with Plaintiffs' First Amendment rights - and equally the rights of those similarly situated - there is no question that Plaintiffs have a significant likelihood of success on the merits.

B. Plaintiffs Will Suffer Irreparable Harm if the TRO is Denied

Plaintiffs will suffer immediate and irreparable injury if Denver is permitted to continue to violate their civil rights. "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury[.]" *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). If immediate relief is not granted, Plaintiffs' speech will not only be chilled, but there will be an effective denial of their right to demonstrate and to express their political beliefs. Each day, police officers use force, secure in the knowledge that a civil rights case will take years to pursue. But the necessity of Plaintiffs' demonstration, and their speech, is deeply rooted in the time and context in which it is expressed. Additionally, there is a clear injury if police are permitted to continue a weeks-long campaign of excessive force directed at silencing citizens who are calling out the very abuse and brutality to which the police are subjecting them. To be told that the police can dominate you, can decide when and in what manner you express your beliefs, and indeed, whether your beliefs are even worthy of being heard, is nothing short of a tragedy. To permit such continued misconduct and brutality will do irreparable harm to Plaintiffs and those similarly situated.

C. The Threatened Injury Outweighs the Harm that the TRO May Cause the Defendant

To permit Denver Police to continue to violate the rights of demonstrators and to inflict grievous bodily injury on demonstrators would impose a serious threat of injury on Plaintiffs. The weight of the denial of the constitutional right to free expression is a significant injury. And the

risk of the loss of further eyes, more broken skulls, and more severely injured demonstrators

significantly outweighs Defendant's harm in not being able to deny constitutional rights and in not

being permitted to use excessive force against its own citizens to whom DPD swore an oath to

serve and protect.

D.   The Issuance of a TRO Will Not Adversely Affect the Public Interest

As the Tenth Circuit has recognized, "it is always in the public interest to prevent the

violation of a party's constitutional rights." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114,

1145 (10th Cir. 2013) (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012)).  The Tenth

Circuit has done more than paid lip service to this standard, with a plurality finding it within the

public interest to justify enjoining federal statutes governing healthcare in light of individuals'

constitutional rights, *id.* at 1147, and the court affirming a preliminary injunction against a state

legislature to prevent it from certifying a state constitutional amendment that would violate

individuals' constitutional rights, *Awad*, 670 F.3d at 1132.  Indeed, in *Awad*, the Tenth Circuit held

that "[w]hile the public has an interest in the will of the voters being carried out . . . the public has

a more profound and long-term interest in upholding an individual's constitutional rights."  *Id.*

Thus, under the Tenth Circuit's approach, even where individuals' constitutional rights

come into conflict with other important values or public objectives, those other values must yield

to the protection of individuals when it comes to determining the public interest.  This is precisely

such a case.  *Even if* restraining the Denver Police from using excessive, gratuitous force resulted

in some negative consequences, the public interest would *still* favor a TRO here.[1]  Few public

values rise to the level of the enactment of voters' wills; under this Circuit's cases, the rights of

---

[1] Plaintiffs question whether order that can be maintained only by systematic abuse of law-abiding citizens would itself serve the public interest, but as this consideration must yield to individual constitutional rights, the question is not presented here.

individuals still win out.  *See also Cate v. Oldham*, 707 F.2d 1176, 1190 (10th Cir. 1983) (noting "[t]he strong public interest in protecting First Amendment values").

Aside from the clear command that courts in this Circuit are to favor the rights of individuals, any claim that gratuitous and indiscriminate force applied to peaceful citizens is in the public interest is factually incorrect.  As noted above, this kind of police brutality was itself the spark for the wave of demonstrations sweeping the nation, including Denver.  When Denver Police already face a deficit of trust in the eyes of vulnerable citizens, this doubling down on violence threatens to further erode any good will that existed between these putative protectors and the populations they are meant to protect.

Respectfully submitted this 5th day of June 2020.

Ascend Counsel, LLC
*s/ E. Milo Schwab*
Edward Milo Schwab
3000 Lawrence Street
Denver, CO 80205
(303) 888-4407
milo@ascendcounsel.co

Help In Colorado, Ross Ziev, P.C.
*s/ Ross Ziev*
Ross Ziev
6795 E Tennessee Ave Ste. 210
Denver, CO 80224
(303) 351-2567
ross@helpincolorado.com

Wolf Guevara LLP
*s/ Laura B. Wolf*
Laura B. Wolf
John Michael Guevara
1312 17th Street Ste 569
Denver, CO 80202
(303) 802-5390

laura@wolfguevara.com
jm@wolfguevara.com

Attorneys for Plaintiffs