**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-1616-RBJ

AGAZI ABAY,
GABRIEL THORN,
AMY SCHNEIDER, and
MICHAEL McDANIEL, on behalf of themselves
    and other similarly situated individuals,

      Plaintiffs,

v.

CITY AND COUNTY OF DENVER,

      Defendant.

---

## RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

---

Defendant, the City and County of Denver ("Denver"), through undersigned counsel, submits the following response in opposition to Plaintiff's Motion to Convert Temporary Restraining Order into Preliminary Injunction (Doc. # 27) and in preparation for the June 25 evidentiary hearing on Plaintiff's Motion seeking a preliminary injunction:

## <u>INTRODUCTION</u>

Demonstrations responding to the death of George Floyd began in Denver on May 28, 2020. The demonstrations started as peaceful daytime protests but that evening devolved into disorder and acts of violence and vandalism. On May 30, after two nights of significant violence and extensive property damage occurring under the cover of darkness, Mayor Michael Hancock issued an emergency curfew for the hours between 8:00 p.m. until 5:00 a.m. through May 31, 2020. [*See* **Exhibit 1**, Emergency Curfew Order]. After continued violence and destruction, on

June 1, 2020, Mayor Hancock extended the curfew order for the hours between 9:00 p.m. and 5:00 a.m., expiring at 5:00 a.m. on Friday, June 5. [*See* **Exhibit 2**, Extended Emergency Curfew Order.]

On Friday afternoon, June 5, Plaintiffs filed a motion for a temporary restraining order and sought an emergency hearing. [Docs. ##9, 10.] Shortly after, following an abbreviated virtual hearing, the Court issued its Temporary Restraining Order ("TRO," Doc. #16 (as modified by Doc. #21)). As the TRO neared its expiration, Plaintiffs filed three motions seeking to extend the TRO (Doc. #25), amend it to add new terms (Doc. #26), and convert it to a preliminary injunction (Doc. #27). The Court denied each of these motions, ordering the parties to confer and seek agreement on the terms of any extended TRO or preliminary injunction. [Docs. ##29-31.] When the parties could not reach an agreement, the Court *sua sponte* extended the TRO and set an evidentiary hearing. [Docs. ##35-36.]

Plaintiffs ask the Court to enter a preliminary injunction based on the untested allegations of the Complaint, arguing that "no further analysis is necessary." [Doc. #27, p. 5.] Those allegations—including links to various photographs and video pulled from social media without authentication or any indicia that these images are fair and accurate representations of events— rest entirely on events from the first three days of demonstrations. Apart from the bare representations of counsel, Plaintiffs offer no factual allegations, much less evidence, that they are at risk of immediate and irreparable harm. As a result, Plaintiffs lack standing to request the forward-looking relief they seek. Even if they had standing, the social-media evidence upon which Plaintiffs rely is fragmentary; lacks context; depicts third parties, rather than the Plaintiffs themselves; and comes from sources that Plaintiffs cannot identify or authenticate. Under the status quo—which includes a significant change in Colorado state law related to law enforcement action

in response to protests (Colorado Revised Statutes § 24-31-905) and a dramatic reduction in both the size and violence of demonstrations in Denver—Plaintiffs cannot show that they are entitled to the extraordinary relief of a preliminary injunction. Accordingly, Plaintiffs' motion for a preliminary injunction should be denied.

## ARGUMENT

### I.     The Passage of SB 20-217 Moots Any Further Injunctive Relief From this Court.

On June 19, 2020, Governor Polis signed the Law Enforcement Integrity Act ("SB 20-217") into law.  With respect to law enforcement action in response to protest activity, C.R.S. § 24-31-905 provides:

> (1) In response to a protest or demonstration, a law enforcement agency and any person acting on behalf of the law enforcement agency shall not:
>
> (a)     Discharge kinetic impact projectiles and all other non- or less-lethal projectiles in a manner that targets the head, pelvis or back;
>
> (b)     Discharge kinetic impact projectiles indiscriminately into a crowd; or
>
> (c)     Use chemical agents or irritants, including pepper spray and tear gas, prior to issuing an order to disperse in a sufficient manner to ensure the order is heard and repeated, if necessary, followed by sufficient time and space to allow compliance with the order.

This portion of the Act took effect immediately. *Id*. Accordingly, not only do Plaintiffs lack standing to seek prospective injunctive relief, as more fully discussed below, the relief Plaintiffs seek has been mooted by this change in Colorado law.

After conferral last week, the parties agreed that a DPD officer of the rank of sergeant or above could approve the use of chemicals or projectiles for crowd control. [*See* Doc. #34, pp. 3-4.] This change from the terms of the TRO was necessitated by the strain that this requirement put

on the limited number of Denver police supervisors at the rank of lieutenant or above. [*Id.* & Doc. 34-2, ¶ 15.][1] The parties also agree that a supervisor should be present to authorize the use of such weapons, but dispute whether the supervisor must have "personally witnessed" violence before providing such authorization. Requiring that the supervisor "personally witness" violence during chaotic and dangerous situations unintentionally puts officers and the public at risk by delaying a response while waiting for the on-scene supervisor to actually witness the violence with no option to reasonably rely upon information from fellow officers—as the law permits. *See*, *e.g.*, *U.S. v. Hensley*, 469 U.S. 221, 231 (1985) ("[E]ffective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another.") (quoting *United States v. Robinson*, 536 F.2d 1298, 1300 (1976)). There is no legal authority—in SB 20-217 or elsewhere—to support the proposition that supervisors may not rely upon the real-time observations and representations of lower-ranking officers to issue an order to use chemical weapons or projectiles for crowd management. As such, Plaintiffs are not legally entitled to an injunction which imposes such a requirement.

Finally, the requirement for deference to local policymaking bodies in making decisions impacting public safety has been repeatedly recognized by the courts, including the Tenth Circuit. *See*, *e.g.*, *Uhlrig v. Harding,* 64 F.3d 567, 576 (10th Cir. 1995) ("we must be careful not to second guess Defendants' decisions based on the benefit of hindsight, especially where their decision stemmed from a balancing of 'competing social, political, and economic forces.'")

---

[1] Although the Court's June 24, 2020 email to counsel indicated that this was the "number one issue left" for the hearing, this issue was resolved by agreement of the parties, as reflected in their submissions of June 19 (*see* Doc. #33-2 (Plaintiffs' proposed order); Doc. #34-1 (Denver's proposed order) (both specifying "Sergeant or above")).

(quoting *Collins v. City of Harker Heights*, 503 U.S. 115,128 (1992)). If this need for deference means anything, it must mean that a court should hesitate to tell a police department how to structure its chain of command or author policies balancing public and officer safety. Thus, the court should decline to enter a preliminary injunction in this case with any of the additional terms Plaintiffs seek, including, but not limited to, the requirement that Denver "inform Plaintiffs of any use of chemical agents/irritants or KIPs in downtown Denver and the surrounding areas within twenty-four (24) hours of such use." [Doc. #33-2.]

With the enactment of SB 20-217, Plaintiffs no longer need injunctive relief to protect their First Amendment rights to engage in peaceful protest activities. The Colorado Legislature has specifically defined the parameters in which the DPD, and all other law enforcement agencies in Colorado, may use certain weapons—specifically kinetic impact projectiles or other less-lethal projectiles and chemical agents or irritants when responding to a protest or demonstration. The law includes specific instructions regarding the orders law enforcement must give and specifically requires "sufficient time and space to allow compliance" prior to the use of chemical weapons or agents. C.R.S. § 24-31-905(1)(c). For these reasons, Plaintiffs' request for relief in the form of a preliminary injunction is moot and should be denied.

## II.    Plaintiffs Lack Standing to Seek Prospective Relief.

"[S]tanding 'is an essential and unchanging part of the case-or-controversy requirement of Article III.'" *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1153 (10th Cir. 2013) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). For Article III standing, a plaintiff must show: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the

challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Collins v. Daniels*, 916 F.3d 1302, 1311–12 (10th Cir. 2019), *cert. denied*, 140 S. Ct. 203 (2019), *reh'g denied*, 140 S. Ct. 567 (2019) (citations and quotations omitted). "Each plaintiff must have standing to seek each form of relief in each claim." *Id.* (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000); *see Lippoldt v. Cole*, 468 F.3d 1204, 1216 (10th Cir. 2006) ("Plaintiffs have the burden to demonstrate standing for each form of relief sought.")[2]

Not even an injured plaintiff has standing to "maintain a declaratory or injunctive action unless he or she can demonstrate a good chance of being likewise injured in the future." *Barney v. Pulsipher*, 143 F.3d 1299, 1306 n.3 (10th Cir. 1998) (quoting *Facio v. Jones*, 929 F.2d 541, 544 (10th Cir. 1991)). While Plaintiffs here specifically allege harm from previous demonstrations, "past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495 (1974)).

The Supreme Court's holding in *Lyons* dooms Plaintiffs' claims for prospective relief. There, the plaintiff sought both damages and an injunction based on law enforcement's use of a chokehold that injured him. 461 U.S. at 97-98. While the Court found these allegations sufficient to demonstrate that the plaintiff "presumably [had] standing to claim damages," they "d[id]

---

[2] Plaintiffs bring suit on behalf on a putative class of third parties, but that does not change the standing analysis. Without standing to sue on their own behalf, the named Plaintiffs cannot represent others. *Big Elk v. Bd. of Cty. Comm'rs of Osage Cty.*, 3 F. App'x 802, 807 (10th Cir. 2001) ("Because the plaintiffs did not themselves have standing to enjoin the sheriff's department's policy, they cannot bring a class action on behalf of others seeking that same relief."); *see Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976) (threshold question for class certification is whether the plaintiff has standing to sue on his own behalf).

nothing to establish a real and immediate threat" that he would suffer a similar injury in the near future—*i.e.*, "that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part." *Id.* at 105. In short, because there was nothing to show he "faced a real and immediate threat of again being illegally choked," the plaintiff "failed to demonstrate a case or controversy ... that would justify the equitable relief sought." *Id.*

So too here, where the factual allegations of the Complaint relate only to Plaintiffs' past injuries (indeed, mostly the injuries of others); the only allegations regarding future harm are that "Protests are ongoing" and that "Plaintiffs and the Plaintiff Class" have engaged in First Amendment activity and "will continue to do so in the future." [Doc. #4, ¶¶ 81, 99.] Similarly, the current request for a preliminary injunction merely avers that "[t]he demonstrations have continued every day since May 28, 2020 and will continue into the foreseeable future." [Doc. #27, at 7.] Such general and conclusory allegations are "vague and completely lacking in specificity," *Ledbetter v. City of Topeka*, 318 F.3d 1183, 1188 (10th Cir. 2003), and cannot establish the "real and immediate threat" necessary for standing to seek prospective relief. *Lyons*, 461 U.S. at 105.

Plaintiffs also generally allege that their speech has been "chill[ed]," and that "Plaintiffs and the Plaintiff Class reasonably fear further retaliation in the future." [Doc. #4, ¶¶ 97, 102, 108.] But the Supreme Court and the Tenth Circuit have repeatedly "held a plaintiff must demonstrate more than a mere 'subjective chill.'" *Mocek v. City of Albuquerque*, 813 F.3d 912, 933 (10th Cir. 2015), *quoting Meese v. Keene,* 481 U.S. 465, 473 (1987). As in *Mocek*, Plaintiffs here "ha[ve] not alleged any injury beyond a subjective chilling effect. [Their] complaint simply states that [they] fear [they are] now and will again be subjected to such unlawful and unconstitutional

actions." *Id.* Such speculative allegations of an abstract fear of future harm are not enough to invoke this Court's jurisdiction. "In a plea for injunctive relief, a plaintiff cannot maintain standing by asserting an injury based merely on 'subjective apprehensions' that the defendant might act unlawfully." *Finstuen v. Crutcher*, 496 F.3d 1139, 1144 (10th Cir. 2007) (quoting *Lyons*, 461 U.S. at 107 n.8). Yet that is all Plaintiffs put forth here. In fact, Plaintiffs aver that they have and will continue to engage in protest activities; thus, further negating their allegations that their speech has been chilled in any way.

The vague and conclusory allegations in the Complaint fail to establish concrete, particularized, and imminent harm. Because Plaintiffs have failed to demonstrate standing to seek prospective injunctive relief the Court should deny the Motion on that ground alone.

## III. Plaintiffs Cannot Meet the High Standard to Obtain a Preliminary Injunction.

"A preliminary injunction is an extraordinary remedy that is granted only when the movant's right to relief is clear and unequivocal." *McDonnell v. City and County of Denver*, 878 F.3d 1247, 1257 (10th Cir. 2018) (internal citation omitted). To obtain a preliminary injunction, "the moving party must demonstrate four factors: (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (citing *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7 (2008)).

Preliminary injunctions that "don't merely preserve the parties' relative positions pending trial" are disfavored by courts. *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019). "[A] disfavored injunction may exhibit any of three characteristics:

(1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win." *Id.* A party seeking a disfavored injunction "faces a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors: [and] must make a 'strong showing' that these tilt in [their] favor." *Id.* (citing *Fish v. Kobach*, 840 F.3d 710, 724 (10th Cir. 2016)).

Here, Plaintiffs seek a preliminary injunction which changes the status quo and mandates action. However, not only is an injunction of this nature disfavored, but many of the terms that Plaintiffs ask this Court to include in a preliminary injunction bear no relation to the merits of the claims in their Complaint. This is improper because "[a] preliminary injunction is … appropriate to grant intermediate relief of the same character as that which may be granted finally." *Hicks v. Jones*, 332 F. App'x 505, 508 (10th Cir. 2009) (quoting *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945)). Therefore, the party seeking a preliminary injunction "must establish 'a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint.'" *Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir. 2010) (quoting *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994)). A request for a preliminary injunction that does not bear a relation to the merits of the claims in the complaint is properly denied. *Hicks*, 332 F. App'x at 508.

Plaintiffs' Complaint focuses on DPD's use of non- or less-lethal force, alleging that "Plaintiffs' Fourth Amendment rights were violated when they were deliberately targeted and shot with rubber bullets, tear gas, pepper balls, flashbang grenades, and pepper spray during the course of their lawful protests." [Doc. #4, ¶ 96; *id.* at ¶ 107 ("Plaintiffs' First Amendment rights were violated when they was [*sic*] deliberately targeted and shot with rubber bullets, tear gas, pepper spray, pepper balls, and flashbang grenades during the course of their protest activities.").] As

discussed above, the newly enacted Colorado law moots their need for injunctive relief with respect to these factual allegations and claims. Moreover, none of the factual allegations in Plaintiffs' Complaint nor their claims for relief are premised upon or in any way related to the presence (or absence) of DPD command staff during protest activities, the use of body cameras, or Denver's response to public-records requests.

Nevertheless, Plaintiffs now seek an injunction that specifically requires this relief, including mandating the production of expedited document and video production to Plaintiffs' counsel of any incident related to protest activities during which any chemical weapon or projectile is used. The entry of a preliminary injunction requiring Denver to implement a specific body-worn camera policy or a specific supervisory approval process, or mandating the production of documents to Plaintiffs' counsel for purposes of this lawsuit outside the rules of discovery, bears no relation to the merits of their claims and seeks to improperly invade the Department of Safety's role in making public safety decisions and regulating law enforcement. *See Hicks*, 332 F. App'x at 508; *see, e.g.*, *Uhlrig,* 64 F.3d at 574. Plaintiffs cannot show the nexus between the order they seek and the harms they allege. Thus, even before any analysis of the four factors, the Court should conclude that they are simply not entitled to the injunctive relief they request here.

### A. Plaintiffs cannot establish a likelihood of success on their municipal liability claims because they cannot show any Denver policy, custom or practice was the moving force for the constitutional violations they allege

The heightened standard applicable to disfavored preliminary injunctions requires Plaintiffs to make a strong showing that their municipal liability claims premised upon the alleged violation of their First and Fourth Amendment rights are substantially likely to succeed on their merits. *Free the Nipple*, 916 F.3d at 798. "[T]he burden is upon the one requesting such relief to

make a prima facie case showing a reasonable probability that he will ultimately be entitled to the relief sought." *Automated Mktg. Sys., Inc. v. Martin*, 467 F.2d 1181, 1183 (10th Cir. 1972). Plaintiffs cannot make this showing because they cannot demonstrate a likelihood of establishing that Denver had a custom, policy or practice of violating the First or Fourth Amendment in response to peaceful protest activities, much less that Denver acted with deliberate indifference to a substantial risk of such violations or that such a custom or practice was the moving force behind any of the Plaintiffs' alleged injuries.[3]

To prove a municipal liability claim against Denver, Plaintiffs must first show that a Denver employee violated their constitutional rights.[4] *See Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993) (a municipality may not be held liable when there is not an underlying constitutional violation by any of its officers). In addition, Plaintiffs must show that a Denver custom or policy was the moving force behind the constitutional violation and that Denver acted with deliberate indifference. *Harte v. Bd. of Comm'rs of Cnty. of Johnson, Kansas*, 863 F.3d 1154, 1195 (10th Cir. 2017). The deliberate-indifference standard is met if a "municipality has actual or constructive notice that its action or failure is substantially certain to result in a constitutional violation, and it consciously and deliberately chooses to disregard the risk of harm." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1318 (10th Cir. 2002). Further, when

---

[3]To the extent that Plaintiffs may attempt to argue that this Court has already held in their favor on the "likelihood of success on the merits" analysis, Denver notes that the Court's TRO, entered on an emergency basis after extremely limited argument and briefing, contains no findings regarding the elements of a municipal-liability claim, but rather analyzed only the elements of individual Fourth and First Amendment claims. [Doc. #16, pp. 4-7.]

[4] For purposes of this response, Denver assumes *arguendo* that based upon the facts alleged in Plaintiff's Complaint an underlying constitutional violation may be shown.

determining the issue of municipal liability, courts must rigorously apply the causation and culpability requirements. *Cacioppo v. Town of Vail*, 528 F. App'x. 929, 931 (10th Cir. 2013) ("[W]here a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability." (quoting *Bd. of Cnty Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 415 (1997)).

A policy or custom may take the form of (1) a formal regulation or policy statement, (2) an informal custom that amounts to a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law, (3) decisions of employees with final policymaking authority, (4) ratification by final policymakers of their subordinates' decisions, and of the basis of those decisions, or (5) the failure to adequately train or supervise employees. *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010). Plaintiffs' municipal-liability claims here rest on allegations of a widespread practice and failure to train. [Doc. #4, ¶¶ 72-77.]

Specifically, Plaintiffs allege that Denver has a custom or policy of deploying chemical agents and injurious less-lethal ballistics against protesters without provocation, and of targeting peaceful protestors, the press, and medics and using force to simply show its dominance. [*Id.* at ¶ 73]. As support for these allegations, Plaintiffs rely on unauthenticated videos that they claim depict DPD officers using pepper spray or other less-lethal weapons on people doing nothing more than documenting their actions (*id.* at ¶¶ 22-23, Exs. F, G) or for simply talking back to them (*id.* at ¶ 20, Exs. B, C, D, E). Plaintiffs baldly allege that Denver failed to train officers on the use of chemical agents or less lethal ballistics and claim that they were indiscriminately

shooting rubber bullets at demonstrators' heads and groins[5] (*id.* at ¶74) and citing news stories regarding individuals who contend they were struck in the eye with "rubber bullets." [*Id.* at ¶¶ 33-34, Exs. I, J.] Plaintiffs allege that "[t]he targeting of heads is a common feature of the Police's response to protesters," that the "City of Denver has failed to train the DPD on proper use of these ordinances [*sic*]," and that DPD "is using force against peaceful protesters." [*Id*. at ¶¶ 35-36.] These allegations are not only inaccurate, they are insufficient to establish a likelihood of success on the merits of the municipal-liability claims against Denver.

A municipal policy may take the form of a "longstanding practice or custom that becomes 'standard operating procedure.'" *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). A single unconstitutional incident is ordinarily insufficient for municipal liability, but such an incident may sufficient when caused by an existing policy that can be attributed to a municipal policymaker. *Murphy v. City of Tulsa,* 950 F.3d 641, 649 (10th Cir. 2019). Plaintiffs offer no authority for their implicit argument that merely pointing to a few events captured on video— without knowing whether the video is a fair and accurate representation of what was occurring at the time—and stemming from protest activities which devolved into violence and destruction occurring over a period of 72 hours is sufficient to establish, without more, the existence of a widespread practice or custom.

The force used in response to the civil unrest since March 28, 2020, has been measured and proportional to the danger faced by police officers from a small percentage of people who had gathered with other demonstrators engaged in peaceful protest [*See* Doc. #34-2.] The social-media

---

[5] As the Court was informed during the TRO hearing, DPD does not employ weapons which discharge rubber bullets.

evidence put forth by Plaintiffs, when considered in full context and with the perspective of those on the scene, confirms that Plaintiffs cannot show the existence of a widespread custom or practice of violating First or Fourth Amendment rights of peaceful protestors. Plaintiffs have submitted short videos of the earliest demonstrations but have not provided any information regarding the sources or authors of these exhibits, or even the date and time of the events they depict. Denver has nonetheless been able to identify the location and time of some of the incidents depicted in Plaintiffs' exhibits based upon locations and officers depicted in the videos and has been able to establish that the videos have been mischaracterized and are also incomplete and misleading.

*Exhibit E:* For example, Plaintiffs describe Exhibit E to their Complaint as showing "a line of officer [*sic*] spraying people without provocation" and allege that it demonstrates "that the Denver Police are not using pepper spray in a limited manner, but instead as a tool to suppress expression they don't appreciate." [Doc. #4, ¶ 22.] In fact, what was occurring at the time (which the submitted video either failed to capture or edited out) was that a small number of Denver Sheriff Deputies were attempting to disperse a large crowd that was threatening to pull down a temporary fence erected to protect the Downtown Detention Center and the Lindsey-Flanigan Courthouse during the evening of May 29. As described in the declaration of DSD Captain Kelly Bruning and depicted in the video exhibits attached to his declaration, a large group of protestors ignored orders to stay back and began to try to climb or pull down the fence, in fact knocking it down in one area. [**Exhibit 3**, (Declaration of Kelly Bruning); **Exhibit 3-1** (video).] Protestors were also throwing bottles and rocks at the deputies. Captain Bruning, who was on scene, after witnessing the violence, authorized the use of pepper spray to protect the safety of the outnumbered deputies and ensure that they were able to continue to protect the jail and courthouse. [Ex. 3, ¶ 9.]

*Exhibit L:* Plaintiffs characterize Exhibit L as "video of police throwing teargas unprompted into a peaceful crowd," alleging that it demonstrates that "[t]he Denver Police is [*sic*] and continues to use these weapons to send the message that they are to be feared, that they are there to dominate, and that they will use their weapons to silence any person they feel is not respecting their authority." [Doc. #4, ¶ 38.] But again, the facts belie this interpretation. Lieutenant Thomas Pine, who appears in the video, will testify that this incident took place on May 28, the first night of the protests. He will explain that officers arrived to assist drivers who were trapped by demonstrators who were blocking the street and were assaulted with rocks and bottles from the steps of the Capitol and he will describe the specific steps the officers took in response, including giving repeated announcements to the crowd ordering them to disperse. Lt. Pine will also explain what occurred just prior to the video depicted in Exhibit L started, including explaining why he is seen pointing on the video just before the officers use the force depicted by the video.

*Exhibit F*: According to Plaintiffs, "In Exhibit F, we see a peaceful protester documenting a team of police in riot gear in broad daylight. When one of the officers notices the filmmaker, he takes action by targeting the filmmaker and shooting him with a pepper bullet." [Doc. #4, ¶ 23.] In reality, the targets in this exhibit are the police officers themselves and Sergeant Carla Havard, who appears in the video, will testify as to what was occurring at the time, including the fact that the officers were outnumbered and being physically threatened as they were pelted with rocks, bottles, and other objects.

*Exhibit G:* In paragraph 23 of the Complaint, Plaintiffs describe Exhibit G as a "second video of Denver police shooting at photographers." However, that video shows—at 0:16 to 0:22—precisely the type of violence officers were responding to when they fired pepperballs. A shirtless

man wearing a cowboy hat stops in front of demonstrators filming with phones, aims, and then launches a projectile at the police from a "wrist-rocket" style slingshot. The impact is confirmed by the body-worn camera video submitted by Denver as **Exhibit 4** in which the same shirtless man wearing a cowboy hat is seen across the street firing projectiles; the video concludes with an officer audibly reacting to being struck by a rock. **Exhibit 5** depicts the same scene from another officer's perspective.

In short, Plaintiffs' video evidence—which appears to have been crucial to this Court's finding that a TRO was necessary[6]—cannot withstand close scrutiny. It provides no basis to conclude that, after full investigation of the facts and circumstances, Plaintiffs are likely to prevail on their individual claims for relief based upon any municipal liability theory against Denver, whether premised upon a widespread unconstitutional custom or practice or failure to train.

**B.      Plaintiffs cannot show a likelihood of irreparable harm**

To satisfy the irreparable harm element, Plaintiffs "show that the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (emphasis in original; internal quotation marks omitted). "Irreparable harm, as the name suggests, is harm that cannot be undone, such as by an award of compensatory damages or otherwise." *Salt Lake Tribune Publ'g Co. v. AT&T Corp.*, 320 F.3d 1081, 1105 (10th Cir. 2003).

---

[6] *See* Doc. #16, p. 5 ("The plaintiffs provide video evidence of police conduct at the demonstrations. Those videos show that the officers had ample time for reflection and were not dealing with dangerous conditions. Named plaintiffs were attacked with rubber bullets, tear gas, etc, allegedly solely on the basis of their presence at the demonstrations, their viewpoint, or their attempts to render treatment to injured protestors.")

Here, however, the likelihood of irreparable harm to Plaintiffs has been virtually eliminated by changes in Colorado law and what has taken place prior to and after the TRO was first entered. Most notable among these is the passage of the Law Enforcement Integrity Act [*Supra,* § I; *see also* Doc. #28, pp. 8-9.] This new law incorporates the key elements of this Court's TRO regarding the use of kinetic impact projectiles and chemical agents or irritants against peaceful demonstrators, as described above; *see* C.R.S. § 24-31-905. The passage of the law unquestionably changes the circumstances from that which existed on May 28, 2020 to June 1, 2020, the days upon which the Complaint rests its allegations, and renders injunctive relief on these provisions unnecessary and negates Plaintiffs' ability to demonstrate the imminence necessary to establish irreparable harm the in absence of the entry of a preliminary injunction. *See Carbajal v. Warner*, 561 F. App'x 759, 762 (10th Cir. 2014) (court properly denied injunction that "would amount to little more than … directing the defendants to comply with the law").

While Plaintiffs maintain that "nothing has changed" regarding the demonstrations or the danger of violence (Doc. #27, p. 5), this contention lacks merit in light of the newly enacted Colorado law. Moreover, Denver has already shown (and will further support with testimony at the hearing) that this contention is inaccurate. [Doc. #28, pp. 7-8.] Conditions were already changing when Plaintiffs filed their Complaint and have continued to change since. Plaintiffs themselves admit that "injuries have been nearly eliminated" and that "demonstrations have continued without… property destruction or violence." [Doc. #26, pp. 6, 7.] Moreover, Plaintiffs concede that they have continued to engage in protests. Even as this Court held its virtual hearing on the TRO on June 5, the curfew imposed by Mayor Hancock had expired, and violence had already decreased along with the need for Denver police to use any type of force. Plaintiffs credit

the TRO, but as early as June 2 the demonstrations were becoming more peaceful. Further, while Plaintiffs previously sought emergency relief to prevent an ostensible threat of violence over the Juneteenth holiday (Doc. #25, p. 7), Juneteenth has passed, and Denver is aware of no reports of violence during the protests or the need for Denver police to use force as a form of crowd control. Plaintiffs cannot rely on evidence from late May to demonstrate an imminent threat of future harm now that necessitates the entry of a preliminary injunction.

As modified, the Court's temporary restraining order mandates that "all officers deployed to the demonstrations or engaged in the demonstrations must have their body-worn cameras recording" during "any and all acts of confrontation between police officers and others**,**" and officers "may not intentionally obstruct the camera or recording." [Doc. #16, p. 10; Doc. #21.] But these terms are already imposed by DPD's existing policy on the use of body-worn cameras. *See* DPD Operations Manual § 119.04 (hereafter "BWC Policy," attached as **Exhibit 6**). A preliminary injunction that would do no more than re-enact the existing BWC Policy is unnecessary and negates any showing of a clear and present need for equitable relief.

The BWC Policy requires activation of cameras "prior to any officer-initiated contacts involving actual or potential violations of the law," and specifies that this includes "[a]ny encounter that becomes adversarial." Exh. 5 at §§ 3(a)(1) & 3(a)(1)(g). The policy mandates that officers are responsible for ensuring that the camera is functioning, "properly affixed" and "in a constant state of operational readiness." *Id.* at §§ 4(b)(1-4). This includes the requirement that "[e]ach officer will ensure that their camera is positioned correctly," *i.e.*, not obstructed, and that the officer "verify the camera position by use of the viewer." *Id.* at § 4(b)(2). Officers are subject to escalating discipline for any violations of the BWC Policy or its requirements. *Id*. at § 12. Thus,

Plaintiffs cannot show that imminent harm is likely to result without the preliminary injunction they seek.

Plaintiffs also insist that they will face harm unless this Court continues to enjoin Denver to guarantee that law enforcement officers from other jurisdictions, who agree to assist Denver on a voluntary, cooperative emergency basis, will follow the same use of force and crowd management policies that Denver has enacted. Those independent jurisdictions are not parties here, and the issue of whether officers from one law-enforcement agency are acting as agents of another is governed by state law. *Clark v. Colbert*, 895 F.3d 1258, 1266 (10th Cir. 2018). Under Colorado law, "[a]gency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act. . . . No one factor, including control, is determinative, and the most important factor in determining whether a person is an agent is the right to control, not the fact of control." *City and County of Denver v. Fey Concert Co.*, 960 P.2d 657, 660 (Colo. 1998) (internal quotation marks and citations omitted; emphasis added).

Here, as in other emergency situations, Denver requested the voluntary cooperation of law-enforcement agencies from other jurisdictions. While Denver coordinated their activities during the protests and at times exercised effective command and control over officers from other agencies, neither Denver nor DPD has "the right to control" these independent agencies; their officers; the policies they adopt regarding the use of force; or the training the officers receive regarding those policies. And as a practical matter, any injunction that purports to bind or limit the ability of other jurisdictions to operate under their own policies, or threatens legal liability if they

do not, will have the effect of preventing Denver from receiving any further assistance from these agencies during future emergencies.

Finally, Plaintiffs cannot show that they will be irreparably harmed if they do not receive accelerated and expanded discovery. Plaintiffs object to any "suggest[ion] that Plaintiffs are mere members of society, allowed to request documents of public agencies subject to denials and limitations of public records requests as are contained in the CCJRA." [Doc. #26, p. 5.] While Plaintiffs feel that the CCJRA and other public-records statutes are inadequate, flawed, or "onerous administrative hurdles" (*id.* at 6), their position simply does not show irreparable harm will result to them.

Both Denver and Plaintiffs will be entitled to discovery in this case under the longstanding parameters of the federal rules, and once discovery commences, Plaintiffs will be entitled to request documents such as those they seek to obtain with an injunction. However, not even then will they be entitled to disclosure on demand "within 12 hours" or "within 72 hours." Nor would such disclosure be reasonably feasible, due to the volume of video and other documentation generated by such incidents and the practical and legal requirements of reviewing and redacting this data. [*See* **Exhibit 7**, Declaration of Dik Kushdilian.] Plaintiffs can show no likelihood of harm—much less irreparable harm—from being required to follow the regular discovery rules to which every plaintiff and defendant are subject. For all these reasons, Plaintiffs' inability to show irreparable harm also requires that their request for a preliminary injunction be denied.

### C.     The balance of the harms weighs in favor of Denver

Under the heightened standard for a disfavored preliminary injunction, Plaintiffs must make a strong showing that the balance of harms tips in their favor. *Free the Nipple*, 916 F.3d at

806. Plaintiffs are unable to make this showing. The future harm that Plaintiffs allege – that they will be injured by projectiles or chemical irritants in response to peaceful protest – is speculative, especially given the current climate and the enactment of the Law Enforcement Integrity Act. Moreover, while this Court previously characterized the physical danger to Denver Police as "a hypothetical harm" [Doc. #16, p. 8], Denver and its officers respectfully disagree. More than 70 officers were injured during the violence which resulted during the demonstrations, which "included projectiles being thrown down at police officers, fires started, assaults, and the use of weapons such as handguns and bats." [Doc. #34-2, p. 2.]

### D. The public interest weighs in favor of Denver

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Free the Nipple*, 916 F.3d at 807. But Plaintiffs' asserted rights must be weighed, as this Court has recognized, against other interests of the public that Denver represents and is bound to protect, including the right of "officers [to] protect[] themselves or their community," which itself preserves the speech rights that Plaintiffs purport to advance here. [Doc. # 16, p. 9 (noting "the duty of the police to protect the rights of citizens who demonstrate and protest").] These interests go beyond simply an "increase in property damage," though that damage was severe. *Id.; see* Ed Sealover, "'Absolutely the worst time' for pandemic-addled Denver businesses to suffer setback with riots," *Denver Bus. J.* (Jun. 2, 2020) ("Millions of dollars of damage occurred in recent days to businesses. But some worry the long-term effect on downtown … could be worse."); Shaun

Boyd, "Taxpayers on the hook for damage to state buildings that could cost hundreds of thousands of dollars," *CBS4 Denver* (June 1, 2020) (describing damage to historic structures).[7]

In short, the public's strong interest in the protection of life and the maintenance of order and security goes beyond a mere interest in protecting property from destruction. While the First Amendment "require[s that] in the face of *verbal* challenges to police action, officers and municipalities must respond with restraint," courts must remain "mindful that the preservation of liberty depends in part upon the maintenance of social order." *City of Houston, Tex. v. Hill*, 482 U.S. 451, 471–72 (1987) (emphasis added).

## CONCLUSION

Plaintiffs lack standing to seek the forward-looking injunctive relief that they seek, because they have alleged no concrete, imminent harm—indeed, no such non-speculative risk exists. Even if they had standing to seek an injunction, the relief they seek has been mooted by recent events, especially by the passage of the new Colorado law and they cannot meet the high standard for entitlement to an order that would upset the *status quo* for the entire duration of this litigation. For all of the reasons stated herein, and the evidence which will be presented during the preliminary injunction hearing, Plaintiffs' cannot meet their burden of showing their entitlement to a preliminary injunction and their request should be denied.

DATED this 25th day of June 2020.

---

[7] *Available at* https://www.bizjournals.com/denver/news/2020/06/02/downtown-denver-setback-coronavirus-riots.html; https://denver.cbslocal.com/2020/06/01/taxpayers-damage-state-buildings-could-cost-hundreds-thousands-dollars/.

Respectfully submitted,

*s/Geoffrey C. Klingsporn*

Melanie Lewis, Assistant City Attorney
Conor D. Farley, Assistant City Attorney
Geoffrey C. Klingsporn, Assistant City Attorney
Denver City Attorney's Office, Civil Litigation Section
201 W. Colfax Avenue, Dept. 1108
Denver, CO 80202-5332
Telephone:(720) 913-3100
Facsimile: (720)913-3182
Email: melanie.lewis@denvergov.org
        conor.farley@denvergov.org
        geoffrey.klingsporn@denvergov.org

*Attorneys for Defendant City and County of Denver*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 25th day of June 2020, I electronically filed the foregoing **RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** with the Clerk of the Court using the CM/ECF system which will email a true and accurate copy of the same to the following:

Edward Milo Schwab, Esq.
Ascend Counsel, LLC
Email: milo@ascendcounsel.co

Ross Ziev, Esq.
Help in Colorado, Ross Ziev, PC
Email: ross@helpincolorado.com

*s/ Philip Jett*
Denver City Attorney's Office