**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-1616-RBJ

AGAZI ABAY,
GABRIEL THORN,
AMY SCHNEIDER, and
MICHAEL McDANIEL, on behalf of themselves
    and other similarly situated individuals

        Plaintiffs,

v.

CITY AND COUNTY OF DENVER,

        Defendant.

---

## DENVER'S RESPONSE TO ORDER
## ON MOTION FOR AN ORDER TO SHOW CAUSE

---

Defendant City and County of Denver ("Denver"), through counsel, respectfully submits the following response to the Court's Order on Motion for an Order to Show Cause [Doc. #47] (the "Order"):

The Court has indicated that Denver's Response to the Motion to Show Cause reflected a cavalier attitude toward the Stipulation because it focused on the procedural standard for such motions, instead of providing a response to the substance of Plaintiffs' allegations from the highest levels of the Denver Police Department.

Denver did not provide a substantive response supported by evidence and declarations because its counsel fully and sincerely expected that the proper time to provide such a response would be if and when the Court granted Plaintiffs their requested relief, *i.e.*, to order Denver to show

cause. Counsel's belief was rooted in caselaw stating that a movant must first make a *prima facie* case of disobedience to a court order before the burden shifts to the non-movant to present evidence of compliance or provide an excuse for noncompliance. [Doc. #45, pp. 1-2 (citations omitted).] Counsel also specifically relied on this Court's ruling, earlier in the case, that it would not entertain Plaintiffs' emergency motions "based on speculation as opposed to hard evidence of misconduct," [Doc. #29], and its from-the-bench rejection of Plaintiffs' position at the preliminary injunction hearing that they should be entitled to substantial and expedited discovery from Denver merely based on social media content that troubled them. For these reasons, alongside past experience defending similar show-cause motions, Denver's counsel anticipated that if the Court believed Plaintiffs made a *prima facie* case of contempt, it would order Denver to present a substantive response through briefing or a hearing, putting forth its evidence regarding each alleged violation.

Three weeks after Plaintiffs' Motion was filed, with no ruling from the Court, Denver faced a dilemma. The Court had not ordered any response, but (under Local Rule 7.1(d)) Denver's deadline to submit anything was about to expire, and Denver did not wish to risk the perception that it was confessing the motion. Denver thus filed its initial Response, which was intended only to show that Plaintiffs' Motion—taken on its own terms, without any additional evidence from Denver's ongoing investigation—failed to make the required showing. [*See* Doc. #45, p. 6 (concluding that Plaintiffs' "ambiguous, context-free imagery cannot rise to a *prima facie* showing of contempt, much less clear and convincing evidence.")].

In short, neither DPD nor undersigned counsel has been cavalier about Denver's obligations under Stipulation. They have worked diligently and in good faith to ensure full and ongoing compliance with the Stipulation's terms, and any misapprehension of counsel as to the rules, or

the tone of the brief, should not be imputed to Denver or DPD—nor obscure the fact that the substance of Plaintiffs' allegations was immediately investigated and addressed.

**Denver acted immediately upon receiving notice of potential noncompliance**

Undersigned counsel first learned of Plaintiffs' allegations of noncompliance with the Stipulation through a conferral email from Plaintiffs' counsel, sent shortly after noon on July 22, attaching numerous photos and videos and alleging that these showed officers without body-worn cameras during responses to protest activity on July 1 and 19, 2020, and showed one officer use pepper spray on peaceful demonstrators on July 19, 2020. The conferral email asked defense counsel to provide any information to disprove that violations occurred, warning that Plaintiffs planned to file a motion to show cause by 5:00 p.m. the following day. [*See* Conferral E-mail, July 22, 2020, attached hereto as **Exhibit A**].

Immediately upon receipt of the email, two substantive responses began in earnest. One was an intensive, expedited investigation by Denver's counsel into the allegations, including gathering and reviewing documents from each of the two dates in question and examining hours of the social media video relied upon by Plaintiffs in addition to hours of BWC video. The other was DPD's response, which was to enhance internal processes to ensure its officers were meeting the requirements of the Stipulation.

**Within 48 hours, DPD implemented enhanced procedures**

Counsel immediately informed DPD command staff of Plaintiffs' allegations. Without waiting for the outcome of counsel's investigation into whether any violations of the Stipulation occurred, DPD immediately began evaluating ways to ensure that its commitment to full compliance with the Stipulation's terms was being met. The alleged acts of non-compliance concerned

events transpiring after the Department had already communicated the Stipulation's requirements to officers. To address any possibility that there were gaps in that communication, DPD developed a new procedure to ensure all officers were accountable to the terms of the Stipulation before each and every response to protest activity. [Declaration of Paul M. Pazen, attached hereto as **Exhibit B**, at ¶¶ 6-7].

A checklist was developed for responsible supervisors to ensure that all Denver police officers under their supervision are equipped with body-worn cameras, properly affixed to their uniforms, prior to being deployed to protest activity. [*Id.*, ¶ 7]. Supervisors must also confirm that any officers from outside jurisdictions present at the request of DPD are aware of and comply with the requirements of the Stipulation. [*Id.*, ¶ 7]. The checklist also requires the incident commander for each police response to protest activity include the Stipulation's body-worn camera and other requirements in a written operations plan, and to verbally review these requirements in each supervisory briefing before a response to protest activity. [*Id.*, ¶ 7]. The checklist was implemented on July 24, 2020, within 48 hours of being notified of potential violations of the Stipulation's body camera requirements. [*Id.*]. It has been used since that date, and undersigned counsel is not aware of any allegations of non-compliance since.

In addition, because some of the photos sent from Plaintiffs' counsel depicted Colorado State Troopers who responded to assist with a volatile confrontation between adverse groups on July 19, 2020, and because the Colorado State Patrol did not have body cameras at that time, DPD worked with the Colorado State Patrol to supply them with body cameras for their troopers to use when responding to protest activity at the request of DPD. [*Id.*, ¶ 10]. As these actions demonstrate,

DPD – at its highest levels – has been fully committed to compliance with the Stipulation and considers such compliance to be of utmost importance. [*See id.* at ¶¶ 2-10].

**Counsel immediately investigated the incidents and responded to Plaintiffs**

Defense counsel also put extraordinary effort into investigating Plaintiffs' allegations and responding to them on the extremely expedited timetable they demanded. This effort involved collecting and reviewing DPD documents and officers' BWC videos, working with Plaintiffs' counsel to gain access to the social media videos from which the Plaintiffs took screenshots, and then reviewing that video to locate the footage from which Plaintiffs' screenshots were taken. This review was needed to determine if the officers pictured were or were not wearing cameras; if not, why not; and the circumstances of the pepper-spray deployment on July 19, 2020, and pepperballs on July 1, 2020.

Counsel were unable to complete a comprehensive review on Plaintiffs' expedited timetable, yet they conferred via telephone and email regarding what they were able to learn regarding the circumstances. It became apparent that Denver would be unable to satisfy Plaintiffs regarding each image and video without providing Plaintiffs expedited discovery on each incident, a task not possible on Plaintiffs' schedule and inconsistent with this Court's admonition during the preliminary injunction hearing. At this point, Denver's counsel told Plaintiffs' counsel that they could not reasonably accomplish this and if Plaintiffs felt they had a sufficient basis to seek relief from the Court, Denver would respond in that forum. [*See* Conferral E-mail, July 27, 2020, attached as **Exhibit C**, at p. 1 (responding to Plaintiffs' request for a response by noon that day)].

After Plaintiffs filed their Motion for Order to Show Cause, counsel continued their investigation and determined the following:

- The use of pepperballs on July 1, 2020, occurred at the direction of a sergeant more than 30 minutes after police twice warned individuals attempting to establish an "autonomous zone" in Civic Center Park that they were violating park curfew; after police issued at least two dispersal orders over a loudspeaker; and when demonstrators physically assaulted officers with mace and a fire extinguisher and attempted to disarm an officer. [*See* Supervisor's Use of Force Coversheet with officer statements, attached hereto as **Exhibit D**].

- The supervisors in charge of the District Six Field Force Team that was involved in clearing Civic Center Park on July 1, 2020, personally checked each member of the team to ensure they were wearing properly mounted BWC before they were deployed. The use of force during the incident was documented on officers' body cameras. The three officers pictured in Plaintiffs' Exhibits 1, 2, and 3 were from another district who responded to a call for assistance and arrived at the scene after Civic Center Park already was cleared and when the use of force was over.[1]

- The identities of the individuals shown in Plaintiffs' Exhibits 18 and 19, which come from YouTube video taken in the early morning hours of July 2, 2020, are unknown. It is also unknown how they obtained the injuries shown in the photos. No officer was found to have deployed pepperballs in a manner that targeted the head, pelvis or back. [*See generally* Exhibit D].

---

[1] Undersigned counsel is working to obtain a declaration attesting to these facts in the next two days. In the interests of getting this Response before the Court without delay, however, counsel submits this Response as an officer of the court and will supplement with a declaration if one is finalized before the Court rules on the Plaintiffs' Motion.

- On July 19, 2020, a pro-law enforcement group held a rally at the Amphitheater in Civic Center Park, and an anti-law enforcement group marched from the Capitol building into the amphitheater with the stated goal of shutting down that rally. [*See* Declaration of Kevin Carroll, attached hereto as **Exhibit E**, at ¶¶ 2, 4]. The counterdemonstrators greatly outnumbered the rally participants, and fights broke out between members of the two groups. [*Id.*, ¶ 5]. Denver police officers had to break up the fights and form a line to keep the groups separated and safe. The rally participants ended up leaving the event to prevent further conflict. [*Id.*]. After the rally participants left, Denver police officers began leaving to de-escalate the situation. [*Id.*, ¶6]. Members of one police unit were followed by a hostile crowd that outnumbered the officers. [*Id.*, ¶ 6]. The crowd aggressively surged toward the officers and came within an arm's reach of the officers, who were unable to maintain a safe distance as they backed away from the crowd. [*Id.*, ¶ 9; *see also* Doc. # 44-10 (showing the proximity of the crowd to officers)]. A sergeant in the group deployed pepper spray at the crowd for the safety of himself and other officers who were being surrounded by the crowd. [Exhibit E, ¶¶ 9-10]. The pepper spray was not used to disperse individuals engaged in an unlawful assembly or similar law violations such as violating park curfew, but instead was deployed under exigent circumstances for the safety of officers confronted with a volatile and dangerous situation.

- The officers shown in Plaintiffs' Exhibits 7-9 who are not wearing BWC are not Denver police officers. As explained above, DPD has since supplied the Colorado

State Patrol with body cameras to use when called upon by DPD to assist with a response to protest activity. [*See* Pazen Declaration, Exhibit B, ¶ 10].

- The identity of the officer shown in Exhibit 5 is unknown, and it is unknown why a body camera is not visible on the officer's turtle gear.

- The officer shown in Exhibit 6 is Commander Aaron Sanchez, who was working in the Command Center on July 19, 2020. When counterdemonstrators began marching toward Civic Center Park, Commander Sanchez left the Command Center on an urgent basis to go to the event site and talk to rally organizers about possibly leaving to prevent further conflict. [Pazen Declaration, Exhibit B, ¶ 9]. He did not participate in the field response to the protest activity. Chief Pazen has since directed that any officer responding to protest activity, even command staff who do not intend to engage in the field response, be equipped with body worn cameras. [*Id.*, ¶ 9].

- The officer shown in Exhibit 10 is Lt. Kevin Carroll, who was wearing BWC on that date. [*See* Carroll Declaration, Exhibit E, at ¶ 13].

As these facts demonstrate, Denver police officers did not violate the terms of the Stipulation by using chemical agents on either July 1, 2020, or July 19, 2020. The Stipulation requires that a supervisor at the rank of sergeant or above specifically authorize the use of pepper spray or pepperballs against demonstrators in response to specific acts of violence personally witnessed by the sergeant. [Doc. # 40, p. 2]. Neither the use of pepperballs on July 1, 2020, nor the use of pepper spray on July 19, 2020, violated this requirement, and Plaintiffs fail to establish that either incident violated the Stipulation. More importantly, Plaintiffs present no evidence of ongoing

noncompliance with Stipulation's requirements regarding dispersal orders or the use of chemical agents such that the Court's intervention is needed to ensure future compliance. To the extent that Plaintiffs attempt to use the Stipulation as a vehicle to challenge the reasonableness of past uses of force involving third parties not before the Court, such questions are more appropriately reserved for any proceeding brought by those individuals, not through contempt proceedings, which are generally remedial in nature. *Eighth Dist. Elec. Pension Fund v. Elec. Forces LLC*, No. 07-CV-01465-LTB-CBS, 2011 WL 1399691, at \*2 (D. Colo. Mar. 28, 2011), *report and recommendation adopted*, No. 07-CV-01465-LTB-CBS, 2011 WL 1397208 (D. Colo. Apr. 13, 2011)

The above facts also refute Plaintiffs' contention that Denver has repeatedly violated the Stipulation's requirement that officers deployed to protest activity be equipped with body-worn cameras and record acts of confrontation between police officers and others. The events of July 1 and July 19 combined involved more than 150 Denver police officers. Of that number, Plaintiff identifies only five who did not have body cameras visible. Plaintiffs have not claimed that any of the five officers depicted in the photos were involved in a use of force involving a demonstrator, or that any use of force was not captured on body camera as required by the Stipulation. These five incidents were rare aberrations from overwhelming compliance with the terms of the Stipulation. Still, DPD took immediate action after being notified of these isolated incidents by adopting new procedures to ensure that they would not recur. In these circumstances, a finding of contempt is not warranted.

## Conclusion

DPD considers compliance with the terms of the Stipulation as a matter of utmost importance, and it has taken numerous steps to ensure its obligations are being met. Based on its

investigation, and the evidence supplied with this Response, Denver continues to believe that

Plaintiffs have not shown, and cannot show, a pattern of misconduct or disregard of the Stipulation

that would justify contempt proceedings.

WHEREFORE, the City and County of Denver respectfully requests that the Court deny

Plaintiffs' Motion for Order to Show Cause. In the alternative, should the Court grant the motion,

Denver respectfully requests an evidentiary hearing.

DATED this 15th day of December 2020.

Respectfully submitted,

*s/ Melanie B. Lewis*
Melanie B. Lewis, Assistant City Attorney
Conor D. Farley, Assistant City Attorney
Geoffrey Klingsporn, Assistant City Attorney
Denver City Attorney's Office, Civil Litigation Section
201 W. Colfax Avenue, Dept. 1108
Denver, CO 80202-5332
Telephone:(720) 913-3100
Facsimile: (720)913-3182
Email: melanie.lewis@denvergov.org
        conor.farley@denvergov.org
        geoffrey.klingsporn@denvergov.org
*Counsel for Defendant City and County of Denver*

## CERTIFICATE OF SERVICE

I certify that on this 15th day of December 2020, I filed the foregoing **DENVER'S RE-SPONSE TO ORDER ON MOTION FOR AN ORDER TO SHOW CAUSE** with the Clerk of the Court using the CM/ECF system, which will email a true and accurate copy of the same to the following:

Edward Milo Schwab, Esq.
Ascend Counsel, LLC
Email: milo@ascendcounsel.co

Ross Ziev
Help In Colorado
Ross Ziev, PC
Email: ross@helpincolorado.com

*Counsel for Plaintiffs*

*s/ Melanie Lewis*
Denver City Attorney's Office