IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-01616-RBJ

AGAZI ABAY,
GABRIEL THORN,
AMY SCHNEIDER, and
MICHAEL McDANIEL, on behalf of themselves
and other similarly situated individuals

    Plaintiffs,

v.

CITY AND COUNTY OF DENVER,

    Defendant.

---

### DECLARATION OF KEVIN CARROLL

I, Kevin Carroll, declare pursuant to 28 U.S.C. § 1746 the following based on my personal knowledge:

1. I am currently employed by the Denver Police Department (DPD), where I have worked for the past 28 years. I currently hold the rank of Lieutenant in the Special Operations Response Team, formally the Gang Unit, which investigates gang crimes and serves as a response team for major events in the City and County of Denver.

2. On July 19, 2020, the Gang Unit responded to a rally at Civic Center Park organized by a group in support of men and women in law enforcement. DPD learned that an anti-law enforcement group planned to hold a demonstration at the Colorado State Capitol at the same time as the rally, with the stated goal of shutting down the pro-law enforcement rally. The

**EXHIBIT E**

Gang Unit and other DPD officers responded to ensure the safety of all participants and bystanders, and to take law enforcement action if needed.

3. I was one of the commanders who was involved with the response and was in charge of officers from the Gang Unit who were on the scene.

4. During the rally, demonstrators from the anti-law enforcement group marched from the Capitol into the Amphitheater in Civic Center Park where the rally was ongoing. Fights broke out between members of the two different groups. My unit went into the Amphitheatre to break up the fights and form a line between the two groups to keep them separated.

5. The counter-demonstrators who converged on the rally greatly outnumbered the amount of people attending the rally, and I asked organizers of the rally if they would consider leaving to avoid further conflict. They agreed and began leaving. As they were leaving, a large group of demonstrators followed them. Individuals from the two groups engaged in some pushing and shoving, but no major fights erupted at that moment.

6. After the rally participants had exited, DPD commanders made the decision to have DPD officers leave the park to de-escalate the situation. My unit began to exit the west side of the park behind the Amphitheatre. We were followed by a large crowd of hostile demonstrators who were screaming at officers while converging on them. I was in the front of the unit, which was backing away from the advancing crowd, as we exited the park. I learned that a sergeant, who was at the rear of the unit, deployed pepper spray at the advancing crowd. I did not personally witness the use of pepper spray when it occurred.

7. DPD policy requires a supervisor to conduct an independent review of any incident in which a subordinate deployed a chemical agent or munition. The supervisor is

**EXHIBIT E**

required to collect and review evidence, determine if the incident involved potential policy or law violations, and prepare a Supervisor's Use of Force Cover Sheet summarizing the investigation. The Supervisor's Use of Force Cover Sheet then is sent to a commander for approval and another copy goes to Internal Affairs for an independent evaluation of whether the incident potentially violated policy and warranted further investigation.

8. As the sergeant's supervisor, I reviewed the sergeant's July 19, 2020, use of pepper spray by reading officer statements, CAD reports, watching body camera video, and viewing video from a High Activity Location Observation, or "HALO," camera.

9. I concluded my review on July 20, 2020. I found no policy violations for the sergeant's pepper spray. The sergeant was in a group of officers that was surrounded and becoming overwhelmed by a hostile crowd. The officers were attempting to leave the park, and the crowd surged toward the officers aggressively. The sergeant reported that several members in the crowd were less than an arm's reach of the officers, they were quickening their pace toward the officers, and the officers who were walking backward away from the group were unable to maintain a safe distance from the group. The body camera video that I watched supports this statement.

10. The situation was volatile and dangerous, and the sergeant used the pepper spray toward the surging group for his safety the safety of other officers as they retreated from a direct and immediate threat.

11. I prepared a Supervisor's Use of Force Coversheet detailing my investigation and recommendation, and the document was sent up my chain of command for approval and was also routed to Internal Affairs.

**EXHIBIT E**

12. I was also aware that Denver police officers were prohibited from using chemical agents unless an on-scene supervisor at the rank of sergeant or above specifically authorized it in response to acts of violence or destruction of property that the sergeant personally witnessed absent exigent circumstances. I believed that the sergeant's use of pepper spray on July 19, 2020, was consistent with this requirement.

13. I am the officer shown in the photo that is Exhibit 10. As is evident in the sergeant's BWC footage from that day, I responded to the incident with my BWC attached to my uniform and had it attached to the ballistic vest that I wore over my vest when we were in the Amphitheater. (See still photos attached as Exhibit 1.) I do not know at what time the photo in Exhibit 10 was taken, but it appears it was taken before I moved my camera to the ballistic vest that I put on over my uniform.

I declare under penalty of perjury that the foregoing statements are true and correct.

Executed on:

12/11/20
Date

Kevin Carroll

**EXHIBIT E**



**EXHIBIT 1**

**EXHIBIT E**