IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-CV-1616-RBJ

AGAZI ABAY,
GABRIEL THORN,
AMY SCHNEIDER, and
MICHAEL MCDANIEL,

      Plaintiffs

v.

CITY AND COUNTY OF DENVER, COLORADO,
PATRICK PHELAN, FORMER DPD COMMANDER,

      Defendants.

---

## FIRST AMENDED COMPLAINT AND JURY DEMAND

Now come Plaintiffs, Agazi Abay, Amy Schneider, and Gabriel Thorn, through their attorneys, LOEVY & LOEVY, and hereby complain of Defendants City and County of Denver and Patrick Phelan, former DPD Commander, as follows:

### INTRODUCTION

1.    This action arises out of protests in Denver and across the nation following the murder of George Floyd on May 25, 2020, by Minneapolis police officers. The events in Minneapolis brought out millions of people around the country at once to peacefully protest the deaths of Black and brown people by law enforcement and vigilantes condoned by local law enforcement as well as the systemic racism that oppresses Black, Indigenous, and people of color. Despite the COVID-19 pandemic, thousands of people came out to demonstrate in Denver and elsewhere in Colorado.

Exhibit A

2.      Although the protests were overwhelmingly peaceful, the Denver

Police Department ("DPD") and officers from other agencies in DPD's mutual-aid

network used violent crowd control tactics against these peaceful protestors. Over

the course of several days, the DPD and its mutual-aid officers deployed

constitutionally unlawful crowd control tactics, including kettling, indiscriminate

and unwarned launching of tear gas and flashbangs into crowds and at individuals,

and shooting projectiles at protestors. These protestors included many young Black

and brown people.

3.      The DPD and its mutual-aid officers knowingly placed these protestors

in physical danger through indiscriminate use of excessive force.

4.      The DPD and its mutual-aid officers intentionally used force on

peaceful protestors with no lawful justification.

5.      Not only did this excessive use of force injure many protestors,

journalists, and bystanders, but it chilled individuals from exercising their First

Amendment rights and suppressed speech.

6.      The DPD and its mutual-aid officers targeted journalists and others

simply documenting their conduct. They also targeted medics who were seeking to

give aid to those harmed.

7.      Although the protests were overwhelmingly peaceful, the DPD

arrested over 350 people over the course of several days beginning on May 28, 2020,

the first day of the protests in Denver, most of whom were arrested solely for

violating Denver's emergency nighttime curfew order, which was in effect from May 30 through June 5, 2020.

8.      For numerous days beginning on May 28, 2020, the DPD and its mutual-aid officers used methods of "less-lethal" force to discourage and suppress peaceful protest in public places (including streets, sidewalks, and parks) in Denver, particularly in the downtown area.

9.      The actions of Defendants City and County of Denver, Patrick Phelan, DPD and its mutual-aid officers infringed on the rights of protestors, journalists, and bystanders to be free from unreasonable seizures and use of force under the Fourth and Fourteenth Amendments.

10.     The purpose and effect of this excessive use of force was to prevent, deter, and suppress protestors from exercising their First Amendment right to exercise freedom of speech, peaceably assemble, and petition for redress of grievances.

11.     Plaintiffs bring this action seeking damages and injunctive relief to redress the harms caused by Defendants and DPD's violent and unconstitutional conduct.

## Jurisdiction

12.     This court has jurisdiction of this action pursuant to 28 U.S.C. § 1331.

13.     Venue is proper under 28 U.S.C. 1391(b). All parties reside in this judicial district, and the events giving rise to the claims asserted herein occurred in this judicial district.

## The Parties

14.     Plaintiff Agazi Abay is a resident of Colorado and a student and former social worker.

15.     Plaintiff Amy Schneider was a political organizer and resident of Colorado.

16.     Plaintiff Gabriel Thorn is a veteran who served in the Armed Forces and a former public employee.

17.     Defendant City and County of Denver ("Denver") is a Colorado municipal corporation. The DPD is an agency of the Defendant City and County of Denver, and all actions of the DPD are the legal responsibility of the City and County of Denver. Denver is sued on the basis of its policies, customs, and practices which gave rise to Plaintiffs' federal civil rights claims.

18.     Defendant Denver delegated to Patrick Phelan, as Incident Commander, final decision- and policymaking authority over the protests and the police response to the protests. Phelan was in charge of coordinating the officers in the field and directed when and what kinds of force officers could use on protestors.

19.     At all material times herein, Defendant Denver was responsible for supervising, enacting, and enforcing the DPD's conduct, policies, and practices; the absence of necessary policies and practices; and for the hiring, retention, supervision, and training of employees and agents of the DPD.

4

20.     Defendant Denver requested the assistance of other law enforcement agencies in responding to the protests, pursuant to mutual-aid agreements. These agencies included the Aurora Police Department ("APD").

21.     A DPD supervisor was embedded with each team of outside officers from the DPD's mutual-aid network, including APD.

22.     Defendant Denver and DPD reviewed its "rules of engagement" with the outside officers from its mutual-aid network before allowing them to provide assistance to the DPD, including APD.

23.     Defendant Denver directed the actions of outside officers from DPD's mutual-aid network, including APD.

24.     As Incident Commander, Defendant Phelan was in charge of the officers from the other law enforcement agencies who provided mutual aid. Phelan gave the same direction, guidance, and rules of engagement to the officers from other agencies as he did to DPD officers.

25.     Defendant Denver was responsible for the actions of the members of its mutual-aid network, including but not limited to the Jefferson County Regional SWAT Team ("JCRS") and Aurora Police Department ("APD").

26.     The acts and omissions of DPD officers and mutual-aid officers were at all material times pursuant to the customs, policies, practices, and/or procedures of Defendant Denver and DPD.

27.     At all times relevant thereto, DPD officers and mutual-aid officers were the agents, servants, and/or employees of Defendant Denver were acting at all

times under color of law and within the scope of their agency or employment and with the knowledge and consent of their principal or employer.

28.     The official and express policy of Defendant Denver was to allow the members of its mutual-aid network to follow their own policies, practices, and/or customs regarding the use of "less-lethal" weapons and use of force during the protests.

29.     Defendant Patrick Phelan was at all relevant times an employee of the DPD and acting within the scope of his employment and under color of law. Defendant Phelan is sued in his individual capacity.

## Factual Background

30.     On Monday, May 25, 2020, a Minneapolis police officer brutally murdered George Floyd, an unarmed and non-resisting Black man, while other police officers stood by and watched.

31.     Innumerable people held peaceful protests across the world condemning police brutality and systemic racism in the wake of the state-sponsored and/or sanctioned/excused murders of George Floyd, Breonna Taylor, Ahmaud Arbery, Elijah McClain, Tony McDade, and countless others.

32.     These constitutionally protected and essential protests occurred amid an unprecedented public health crisis. Novel coronavirus, COVID-19, has killed 1 million Americans, infected millions more, and continues to spread. The virus is commonly understood to be transmittable through exposure to respiratory droplets. At the time of the protests, public health and government officials, including in

Denver, advised people to wear masks if they were outside and to stay six feet apart.

33.     At or around 5:00 p.m. on May 28, 2020, hundreds of protestors gathered at the Colorado State Capitol in downtown Denver to protest police brutality and racism against Black, brown, and Indigenous people in the United States. Protestors carried signs, chanted, and knelt.

34.     Thousands of protestors assembled to demonstrate in Denver every day for many days.

35.     Protestors frequently assembled at the Colorado State Capitol building, but they also marched down streets, primarily in the downtown Denver area.

36.     During the protests, the DPD and its mutual-aid officers employed violent crowd control tactics to corral, intimidate, and suppress the speech of protestors.

37.     DPD and its mutual-aid officers used a variety of "less-lethal" weapons, including tear gas, flashbang grenades, PepperBalls, rubber bullets, and other projectiles fired directly at protestors.

38.     DPD and its mutual-aid officers used these tactics on protestors who were demonstrating peacefully, without first issuing adequate (or any) warnings, lawful (or any) orders, or giving protestors adequate time to disperse.

39.     Tear gas is a general term for aerosolized chemical agents. Tear gas generally includes CS (o-chlorobenzylidene malonitrile) and OC (oleoresin capsicum).

40.     Tear gas activates pain receptors and leads to intense burning pain in the eyes, nose, throat, lungs, skin and mucus membranes. It also causes disorientation, severe coughing, crying, and difficulty breathing.

41.     DPD and its mutual-aid officers also used kinetic impact projectiles ("KIPs") during the protests on peaceful protestors.

42.     KIPs refer to a range of projectiles used in crowd control settings that are made from combinations of rubber, plastic, PVC, various metals, wood, hard foam, and wax, which are often generically referred to as "rubber bullets." These include foam batons and rubber pellets. (The term "rubber bullet" used henceforth has the meaning provided in this paragraph.)

43.     DPD and APD uses 40mm launchers to shoot KIPs.

44.     The 40mm launchers shoot projectiles at a speed of 90 to 100 miles per hour.

45.     KIPs frequently cause contusions or welts.

46.     When shot at close range, KIPs can cause serious bodily injury or death.

47.     When shot from farther range, KIPs have reduced accuracy.

48.     During the protest, APD used launchable tear gas canisters, which were tear gas canisters that they launched from 40mm launchers.

49.     Launching gas canisters from 40mm launchers is extremely dangerous. Gas canisters should never be launched at the body of a person, especially at their head.

50.     In addition, the use of riot control face gear makes the targeting of these weapons even more difficult.

51.     DPD and its mutual-aid officers consistently wore riot gear while present during the protests in Denver beginning on May 28, 2020.

52.     PepperBall guns are air-powered launch devices that fire rounds containing plastic sphere projectiles filled with OC powder. These spheres explode OC powder onto the person who gets hit, causing not only physical pain from the impact, but also causing the person to struggle to breathe.

53.     PepperBalls and pepper spray have an immediate and incapacitating effect that creates a burning sensation to any exposed skin.

54.     Flashbang grenades, also known as noise flash diversionary devices ("NFDDs"), are explosives that make a loud noise and/or flash of light and are made to temporarily blind and/or deafen people and to disorient them.

55.     Flashbang grenades can cause serious bodily injury, including damage to hearing, burns, or even death.

56.     "Stinger" or rubber-ball grenades are high-risk explosive devices that, when detonated, explode 8 grams of flash powder to propel up to 180 rubber-balls in 360 degrees as far as 50 feet. They also emit a bright flash and an approximately 175-decibel noise. When exploding outwards, the rubber balls cause physical pain

and sometimes serious injury, and the light and sound from the blast can be extremely disorienting.

57.    Officers from Denver's mutual-aid network also used other weapons, such as shotguns that fire beanbag rounds. These "beanbags" are generally filled with #9 lead shot. One manufacturer warns that "[s]hots to the head, neck, thorax, heart, or spine can result in fatal or serious injury."

58.    Defendants Denver and Phelan, or Phelan's designee, expressly authorized and approved the mutual-aid officers' use of other, more dangerous weapons that DPD does not normally use, including but not limited to shotguns that fire beanbag rounds.

59.    Over the course of several days, beginning on May 28, 2020, DPD and its mutual-aid officers shot tear gas, PepperBalls, flashbang grenades, Stinger grenades, and KIPs at groups of largely peaceful protestors near the Capitol and in the downtown Denver area.

60.    DPD and its mutual-aid officers used these weapons indiscriminately and without any or adequate warning, even at times when the crowd was merely chanting, kneeling, or standing with their hands up.

61.    Many people were hit with projectiles and thousands inhaled tear gas or suffered pain and burning in their eyes, nose, mouth and throat from PepperBalls and tear gas used by the officers.

62.    DPD and its mutual-aid officers also used "kettling" as a tactic against the protestors. Kettling, which derives from a German military term referring to an

army surrounded by a much larger force, is a police tactic whereby officers confine a large group of people to a designated space by surrounding them on all sides so that there is no escape. By doing so, the officers effectively control people's movements.

63.     Kettling leads to the unlawful seizure of people without a reasonable basis, creates panic, elevates tensions, and chills speech. DPD and its mutual-aid officers accomplished this by forming police lines around protestors. They also kettled protestors before using "less-lethal" weapons on them such as tear gassing, pepper spraying, throwing flashbangs, and shooting rubber bullets at them.

64.     One tactic used by DPD and its mutual-aid officers during the protests was to chase nonviolent protestors into alleys, trap them, and then shoot chemical weapons such as tear gas or pepper spray at them, and/or flashbang grenades.

65.     On Friday, May 29, 2020, peaceful protestors again gathered at the Capitol. DPD officers near the protest site at the Capitol wore riot gear. Protestors chanted, "Why are you in riot gear, I don't see no riot here." Without provocation or warning, DPD officers fired "less-lethal" weapons into the crowd of protestors.

66.     Throughout the hours that followed, DPD officers continued to engage in other violent and intimidating tactics, including shooting protestors who were kneeling and chanting with their hands up.

67.     DPD officers also used "less-lethal" weapons on members of the press as well as individuals recording or photographing their activities.

68.     On Saturday, May 30, 2020, peaceful protestors assembled at the Capitol in the afternoon. In response and over the next several hours, DPD and its mutual-aid officers intimidated protestors with "less-lethal" weapons.

69.     Some DPD and mutual-aid officers fired KIPs, PepperBalls, or pepper spray directly at protestors' heads, faces, and/or groins.

70.     Other DPD officers fired at protestors while hanging off of the side or back of moving police vans or trucks.

71.     DPD officers also shot at protestors from above or an elevated position.

72.     DPD and its mutual-aid officers also shot "less-lethal" weapons at protestors peacefully kneeling on the ground and chanting.

73.     Only DPD officers had PepperBall guns during the protests.

74.     On May 30, 2020, at around 1:00 p.m., the Mayor of Denver declared an "emergency" and announced a curfew order for the entire city, set to begin at 8:00 p.m. that evening.

75.     Denver did not have sufficient justification under the law to declare a "state of local emergency" and issue a citywide "emergency" curfew order.

76.     The curfew was issued while thousands of individuals peacefully marched and demonstrated in Denver.

77.     The curfew was imposed in all public places within the City and County of Denver, including streets and public rights-of-way, from 8:00 p.m. on May 30, 2020 to 5:00 a.m. on Sunday, May 31, 2020, and from 8:00 p.m. on May 31, 2020 until 5:00 a.m. on June 1, 2020.

78.     On June 1, 2020, the Mayor of Denver extended the curfew for four more days. The curfew was in effect each night from 9:00 p.m. to 5:00 a.m. on the evenings of June 1, 2, 3, and 4, 2020, ending at 5:00 a.m. on June 5, 2020.

79.     The constitutionality of the curfew is currently being litigated in a certified class action.

## Factual Allegations

## Plaintiff Amy Schneider

80.     Plaintiff Amy Schneider attended the protests in May and June 2020, including on May 30 and 31 and June 1, 2020. She attended to protest police brutality against Black and brown people.

### *May 30, 2020*

81.     On May 30, 2020, in the late afternoon, Schneider marched with other peaceful protestors in the downtown area.

82.     While Schneider and other protestors were near the 16th Street Mall, between California and Welton, DPD Officers, led by Lt. Vincent Porter, arrived and began shooting PepperBalls at the protestors at about 4:48 p.m.

83.     There was no provocation by the protestors. Protestors had been peacefully chanting, and some of them were kneeling or laying down in front of the officers.

84.     Schneider had been protesting peacefully and taking photos of the protest and the officers.

13

85.     No warnings, orders (including dispersal orders), or announcements were made prior to the use of force.

86.     Officers' use of force on protestors at or about 4:48 p.m. on May 30, 2020 at 16th Street between California and Welton was consistent with DPD policy.

87.     Defendant Phelan authorized the use of force on protestors at or about 4:48 p.m. on May 30, 2020 at 16th Street between California and Welton.

88.     No DPD officers were disciplined for any use of force on protestors at or about 4:48 p.m. on May 30, 2020 at 16th Street between California and Welton.

89.     Schneider went back to the area of the Capitol.

90.     From about 6:00 to 8:00 p.m. on May 30, 2020, DPD and Aurora police officers formed a skirmish line across Colfax, just north of Lincoln.

91.     DPD Gang Unit and Metro/SWAT Officers were standing in the skirmish line across the intersection of Lincoln and Colfax, starting from the southwest curb line.

92.     Numerous DPD supervisors were present.

93.     Aurora police officers were standing in the skirmish line west of the DPD officers, from the southwest curb line west to Broadway.

94.     Only DPD Metro/SWAT officers had flashbang grenades.

95.     Numerous DPD Gang Unit officers and Metro/SWAT officers had PepperBall guns.

96.     Aurora police officers did not have any PepperBall guns.

97.     Aurora police officers did not have any flashbang grenades.

98.    Aurora police officers threw chemical munitions only at the direction or authorization of DPD supervisors, including Defendant Phelan.

99.    Thousands of people were on the Capitol grounds, on Lincoln, and in Veterans Park and Civil Center Park, south of the skirmish line.

100.    The protestors were largely peaceful.

101.    Many protestors were chanting, holding signs, standing with their hands up, or kneeling in front of the officers.

102.    On numerous occasions in the hours before curfew at 8:00 p.m., DPD officers threw flashbang grenades, tear gas, or other chemical munitions into the peaceful crowd of protestors without warning or justification and otherwise indiscriminately used their "less-lethal" weapons on protestors without warning or justification.

103.    No warnings, orders, or announcements were given before the indiscriminate use of force on Schneider and other protestors at the intersection of Lincoln and Colfax between 6:00 and 8:00 p.m. on May 30, 2020.

104.    On this day, and throughout the protests, DPD policy required use of chemical munitions, including tear gas, to be authorized by the Command Post (that is, Incident Commander Defendant Phelan), unless there were exigent circumstances, in which case a command-level officer at the scene could authorize the use of chemical munitions.

105.    Between approximately 6:00 and 8:00 p.m., Schneider peacefully protested in the area of Lincoln and Colfax.

106.    Schneider was gassed numerous times without warning, announcements, dispersal orders, or any justification. She did not commit any act that justified the use of force on her.

107.    When she was gassed, Schneider felt like she could not breathe and at times felt like she was going to die because she could not get any air.

108.    Officers' use of force from approximately 6:00 to 8:00 p.m. on May 30, 2020 at or around the intersection of Lincoln and Colfax was consistent with DPD policy.

109.    Officers' use of force on Schneider on May 30, 2020 at the intersection of Lincoln and Colfax was consistent with DPD policy.

110.    Defendant Phelan authorized the use of chemical munitions and "less-lethal" weapons on protestors between approximately 6:00 and 8:00 p.m. in and around Colfax and Lincoln, Colfax and Broadway, and the area of the Capitol on May 30, 2020.

111.    No DPD officers were disciplined for any use of force on protestors at around the intersection of Lincoln and Colfax on May 30, 2020 from 6:00 to 8:00 p.m.

112.    No DPD officers were disciplined for any use of force on Schneider at the intersection of Lincoln and Colfax on May 30, 2020 from 6:00 to 8:00 p.m.

*May 31, 2020*

113.    On May 31, 2020, Schneider joined other protestors in peacefully marching around the downtown area.

114.    Between approximately 9:30 to 9:45 p.m., Schneider marched with hundreds of others in front of the Basilica on Colfax between Pennsylvania and Logan. She was stopped by a line of Aurora police and JCRS officers that had formed a skirmish line on Pennsylvania, at the direction of Defendant Phelan:



115.    As hundreds of protestors gathered in the block of Colfax between Logan and Pennsylvania, a contingent of DPD officers, led by Lt. Williams, formed a line with their bodies and vehicles from the west, at Logan. This, too, was done at the direction of Defendant Phelan.

116.    Schneider was in the group of protestors in front of the Basilica at this time.

117.    Schneider and the other protestors were largely trapped between the Aurora police and JCRS officers on the east, the DPD officers on the west, a tall,

spiky wrought-iron fence on front of the Basilica and its grounds on the north, and large buildings to the south.

118.    Defendant Phelan had ordered the Aurora officers to push protestors west on Colfax from Washington to Pennsylvania, while simultaneously ordering Lt. Williams to push protestors east on Colfax from Grant to Logan.

119.    Indiscriminately and without warning or orders, the officers shot tear gas, flashbang grenades or other explosive devices, and PepperBalls into the crowd from both directions. This is one of the DPD officers throwing gas or other munition from Colfax and Logan:



120.    It was difficult for protestors to escape, although many ran down a narrow alleyway to the south or around the corners of Logan and Pennsylvania to the north.

121.    The area was very crowded with protestors, and there was a significant amount of tear gas and other "less-lethal" weapons being used on protestors from both police sides:



122.    Schneider was gassed during this time. Officers also aimed flashbang grenades at her head. She had not committed any act that justified the use of force on her. Fortunately, she was able to escape the officers' attempt to trap the protestors.

123.    Defendant Phelan watched the events at the Basilica unfold on HALO cameras in real time.

124.    This kettling of and use of force on protestors was directed by Defendant Phelan. Phelan's orders were carried out by officers under his command.

125.    There was no lawful justification for the officers' use of force described in the preceding paragraphs.

126.    The actions of the APD and JCRS officers between 9:30-9:45 p.m. on May 31, 2020, on Colfax between Logan and Pennsylvania were consistent with the policies, practices, and customs of Defendant Denver.

127.    Officers' use of force on protestors on May 31, 2020 between 9:30-9:45 p.m. on May 31, 2020 on Colfax between Logan and Pennsylvania was consistent with DPD policy.

128.    Officers' use of force on Schneider on May 31, 2020 between 9:30-9:45 p.m. on May 31, 2020 on Colfax between Logan and Pennsylvania was consistent with DPD policy.

129.    No DPD officers were disciplined for the use of force on Schneider on May 31, 2020 between 9:30-9:45 p.m. on May 31, 2020 on Colfax between Logan and Pennsylvania.

130.    No DPD officers were disciplined for the use of force on protestors on May 31, 2020 between 9:30-9:45 p.m. on Colfax between Logan and Pennsylvania.

*June 1, 2020*

131.    On June 1, 2020, Schneider joined other protestors who marched downtown. Schneider was with a few hundred other protestors on the Capitol lawn until midnight. The protest was peaceful.

132.    At midnight, dozens of Doe Defendant Officers came out of the shadows at the Capitol, and protestors began chanting, "Why are you in riot gear, I don't see no riot here."

133.    Schneider linked arms with other protestors.

134.     Officers began marching onto the lawn. Without any warning or dispersal order or any words, the officers began tear gassing the demonstrators. The officers also used a noise cannon or some weapon that created an irregular strobing sound that was extremely disorienting.

135.     As Incident Commander, Defendant Phelan directed when and what kinds of force to use on the protestors.

136.     Schneider decided to go home and left.

137.     When Schneider got to Lincoln and Broadway and approximately 13th Avenue, there were approximately 50 officers there. At least some of these officers were DPD Gang Unit Officers under the supervision of Sgt. Anthony Tak.

138.     The Officers surrounded Schneider and some young medics and began shooting them with many pepper balls.

139.     Officers shot at protestors who were not resisting and kept their hands in the air.

140.     The protestors begged the officers to allow them to go home, but the officers continued to shoot them.

141.     Schneider was tackled by a DPD Gang Unit Officer, under the supervision of Sgt. Tak. The officer put his knee into Schneider's back and had his hand on her neck. He pushed her face into the dirt so hard that there was still a faceprint left in the dirt a couple days later:



142.   Schneider kept screaming, "I can't breathe, please let me up." She kept trying to get air but the dirt was blocking her nose.

143.   In addition, because the officer had tackled her so hard, her pants were pulled down in the process. This was humiliating and embarrassing.

144.   The DPD Gang Unit Officer arrested Schneider for curfew violation and failure to obey a lawful order.

145.   Schneider and the other individuals she was with at the time she was arrested were clearly identifiable as protestors.

146. Schneider's arrest was the result of the Defendant Denver's policy of enforcing the curfew only against individuals engaged in protest activity. Schneider is a Class Member in the certified class action challenging the curfew.

147. No officer gave Schneider any orders or said anything to her as she was being tackled to the ground.

148. Schneider was handcuffed and placed into a police van.

149. When one of the protestors who had been gassed began having an asthma attack, the protestors begged the officers to call for medical attention. Instead of providing any, the officers laughed and said, "If you wanted to breathe, you should have stayed home tonight."

150. Schneider was detained for several hours and released because the arresting officer could not book her into jail due to failure to take her picture at the time of arrest.

151. There was no lawful justification for the officers' use of force described in the preceding paragraphs.

152. At no time during her attendance at the protests did Schneider throw anything, commit any act of violence or property destruction, or commit any act that would have justified the use of force on her.

153. On one or more days when she attended the protests and during the events described above, Schneider experienced tear gas and/or pepper spray or other aerosolized chemicals, which caused coughing, difficulty breathing, irritation and burning in the eyes, nose, throat, and mouth and a burning sensation on the

skin. Schneider also had bruises from being shot with Pepperballs. She also had difficulty walking after her arrest because she had been tackled so hard.

### Plaintiff Agazi Abay

154.    Plaintiff Agazi Abay attended the protests in Denver on May 28, 29, and 30, 2020. He attended in order to protest the police brutality and violence against Black and brown people, to make his voice heard and spread awareness about the killing of George Floyd. He also provided assistance to injured protestors as a medic.

*May 28, 2020*

155.    On May 28, 2020, Abay marched and protested peacefully. At 14th Avenue and Sherman, there was a line of DPD officers on 14th Avenue.

156.    Abay and other protestors were chanting and peaceful. At one point, Abay spoke to the crowd.

157.    At about 9:10 p.m., DPD officers tear gassed the entire crowd, without provocation. They also shot PepperBalls at the protestors. Abay did not see anyone throw anything or get aggressive with the police. Abay inhaled tear gas, which caused breathing and vision problems.

158.    DPD Lts. James Williams and Thomas Pine were present and ordered the officers to use tear gas and "less-lethal" weapons on the protestors. As Incident Commander, Defendant Phelan authorized and ordered Williams and Pine to gas the protestors.

159.    Later that evening, Abay was again tear gassed and shot at with KIPs.

24

*May 29, 2020*

160.    On May 29, 2020, Abay again joined the protest where he again observed peaceful protests. Over the course of the evening, more and more police arrived, lobbing tear gas and shooting at protestors. Abay saw people being tear gassed and shot at with KIPs.

161.    Abay attempted to help several people who had been severely tear gassed. One man was so badly injured that he had to be taken away by an ambulance. While attempting to provide medical assistance to them, Abay was targeted by police and further tear gassed.

162.    At no time did Abay pose any threat to the police. Officers' actions were provoked by his support of the protests and efforts to assist injured protestors.

163.    During Abay's tear gassing on Friday evening, he began coughing. The tear gas was so thick and strong that he could not open his eyes. Abay struggled with these severe burning sensations and coughing for at least 15 minutes, and he could not escape the continual bombardment of tear gas from the police.

*May 30, 2020*

164.    Abay once more attended the protest on Saturday, May 30, 2020. He wanted to stay further away from the police violence to give himself a chance to heal from the previous nights' attacks. However, he felt guilty about the violence being done to other protestors, and he ultimately decided to go back to protest and assist those being injured. It was already dark when he arrived.

165.    That evening, one thing that Abay observed was DPD officers in riot gear, hanging off the sides of RDVs, driving around shooting protestors. This was on or near Colfax, further east of the Capitol. It was almost as if the police were playing a game of hide and seek, only when they found someone, they shot at them. Abay never observed the police give any oral commands or warnings.

166.    There was no lawful justification for the officers' use of force described in the preceding paragraphs.

167.    At no time during his attendance at the protests did Abay throw anything, commit any act of violence or property destruction, or commit any act that would have justified the use of force on him.

168.    On one or more days when he attended the protests and during the events described above, Abay experienced tear gas and/or pepper spray or other aerosolized chemicals, which caused coughing, difficulty breathing, irritation and burning in the eyes, nose, throat, and mouth and a burning sensation on the skin. Flashbang grenades or other explosive devices also went off near him. This caused ringing in his ears and scared him greatly. In addition, several weeks later, when Eiljah McClain was killed by police, Abay started crying. He had been gassed so much during the protest that he felt his eyes burning from residual tear gas.

### Plaintiff Gabriel Thorn

169.    Plaintiff Gabriel Thorn attended the protest on May 29 and 31, 2020. He attended to protest police violence against Black and brown people, and he served at times as a medic.

*May 29, 2020*

170.    On May 29, 2020, Thorn observed a largely peaceful protest. He attended for several hours starting in the late afternoon. He saw DPD officers utilize 40 mm launchers, tear gas, flashbang grenades, and PepperBalls. The protestors were attacked indiscriminately with these ordnances and without regard for safety.

171.    This occurred even during the daytime. At one point, Thorn was part of a large crowd listening to a speaker, and officers drove by and shot at people at the edges of the crowd with PepperBalls. Thorn saw an elementary-school aged kid crying because he had been shot.

172.    Thorn also observed police officers aiming at bodies and heads when firing 40 mm rounds. Having served in the military and been trained to use those weapons, Thorn was shocked that these officers had not been trained to use them correctly. His training in the military made clear that these launchers were to be aimed at the ground and never directly at people, even in war zones.

173.    Thorn was gassed repeatedly and shot and hit with PepperBalls dozens of times. He was shot in the head with a 40 mm round. He was fortunate to have been wearing a helmet at the time. It still felt like someone hit him in the head with a 2x4.

174.    Thorn also wore a red cross on his helmet and backpack to indicate that he was a medic there to treat the injured. Numerous times while treating injured people, police officers targeted him and shot PepperBalls at him.

175.    There was one point when he and others were by the Capitol building and crawling around for cover because officers were shooting down at them from the balcony.

176.    Even considering his experience in combat in Afghanistan and Iraq, the police violence on protestors was one of the most intense situations he has ever been in.

177.    Thorn also observed unprovoked drive-by shootings where police officers drove by in vehicles shooting protestors with PepperBalls from the vehicles.

178.    Thorn never heard the police give any warnings, announcements, or dispersal orders. The police only spoke to the protestors through their weapons.

179.    There was no lawful justification for the use of force he observed and experienced. The police violence was indiscriminate.

180.    At no time during his attendance at the protests did Thorn throw anything, commit any act of violence or property destruction, or commit any act that would have justified the use of force on him.

181.    On one or more days when he attended the protests and during the events described above, Thorn experienced tear gas and/or pepper spray or other aerosolized chemicals, which caused coughing, difficulty breathing, irritation and burning in the eyes, nose, throat, and mouth and a burning sensation on the skin. He was hit many times with PepperBalls. Flashbang grenades or other explosive devices also went off near him. This caused ringing in his ears and lost his hearing temporarily.

## Damages

182.   As a direct and proximate cause of the conduct described herein, Plaintiffs were denied their constitutional rights as stated herein, and suffered damages, including but not limited to, mental and emotional distress, physical injuries and bodily harm, pain, fear, humiliation, embarrassment, discomfort, and anxiety, and other damages.

183.   Defendants' and DPD's actions were committed with conscious or reckless disregard for, and deliberate indifference to, Plaintiffs' rights.

## Defendant Denver's Unconstitutional Policies, Practices, and Customs

184.   Defendant Denver has engaged in repeated, widespread violations of law, as outlined above, over the course of several nights, shutting down the exercise of First Amendment activities through the use of indiscriminate and unreasonable force against thousands of protestors; imposing citywide curfews without accommodating, or even attempting to accommodate, the right to peaceable assembly and protest, and specifically targeting protestors with their curfew; at times dispersing lawful and peaceful assemblies without warning and without providing both directions, means, and opportunity to disperse before taking aggressive police action; hitting at least hundreds of protestors with "less-lethal" weapons and/or tear gassing or pepper spraying them; selectively enforcing the curfew against protestors by arresting them for violation of an unlawful curfew and

29

thereby placing them at great risk of exposure to COVID-19;[1] and harassing, intimidating, and/or using force on individuals attempting to record or document police activity in public. In conjunction with a history of protest-related constitutional violations, Defendant Denver's repeated widespread and unlawful acts over several nights and involving many locations constitute an unlawful custom and policy of violating protest participants' constitutional rights.

185.    Defendant Denver had a policy, practice, or widespread custom of failing to give dispersal or audible dispersal orders prior to the use of force at protests.

186.    Defendant Denver had a policy, practice, or widespread custom of inappropriate and indiscriminate use of "less-lethal" weapons including pepper spray, chemical munitions, explosive devices, 40 mm launchers, PepperBalls, and/or other KIPs.

187.    Defendant Denver failed to train its officers in the constitutional responses to peaceful demonstrations, despite the history of such violations in the past and despite the obvious need for such training. The recurrence of the same violations with respect to these protestors indicates an intentional refusal to preserve the constitutional rights of protestors.

188.    Defendant Denver failed to adequately train its officers in the use of "less-lethal" weapons, including 40 mm launchers, PepperBalls, and chemical munitions. The training provided by Defendant Denver was outdated, insufficient,

---

[1] The Van Cise-Simonet Detention Center, where arrestees were taken, was the site of one of the largest COVID-19 outbreaks in the country.

and inconsistent with generally accepted standards and practices. Defendant Denver had knowledge of the importance of training on the proper use of "less-lethal" weapons, and its failure to adequately train officers in the use of these weapons constituted deliberate indifference.

189.   In its report completed after an investigation into the use of force by DPD during the protests, the Office of Independent Monitor concluded that, during the protests, Defendant Denver allowed some DPD officers who were not trained or certified in the use of "less-lethal" weapons to use those weapons against protestors.

190.   Defendant Denver failed to provide *any training* whatsoever to its officers in the use of flashbang grenades or Stinger grenades. These explosive devices can cause serious injuries. They are not intended for the direct application of force against a person and should not be thrown directly at a person. Despite this, flashbang grenades and Stinger grenades were used repeatedly during the protests, frequently thrown into crowds. Defendant Denver's failure to train its officers on the use of flashbang grenades and Stinger grenades directly caused injury to protestors.

191.   Defendant Denver failed to provide any training to the law enforcement officers from outside agencies and did not conduct any joint training exercises with the outside agencies, which was necessary in order to ensure that outside law enforcement officers would not violate the constitutional rights of citizens in Denver.

192.   Defendant Denver failed to adopt adequate policies in the constitutional responses to peaceful demonstrations, despite the history of such

31

violations in the past and despite the obvious need for adequate policies. The recurrence of the same violations with respect to these protestors indicates an intentional refusal to preserve the constitutional rights of protestors.

193.   Defendant Denver failed to adopt *any* policies whatsoever on the use of flashbang grenades or Stinger grenades. In light of the serious and obvious risk of bodily injury and danger posed by flashbang grenades or Stinger grenades, Denver's failure to provide any policies or training on their use posed an obvious risk of violation of the constitutional rights of protestors.

194.   Defendant Denver's failure to provide adequate training or policies that were obviously needed constituted deliberate indifference.

195.   Under DPD Chief of Police Paul Pazen, the prevailing attitude was that training is not important.

196.   For instance, the DPD and Defendant Denver have been called on numerous times dating back at least to 2011 to investigate its use of PepperBalls and other chemical agents against protestors.

197.   After Denver police fired PepperBalls at peaceful protestors on October 29th, 2011 during the Occupy Denver demonstrations in Civic Center Park, Defendant Denver received several complaints and conducted an internal debriefing.

198.   Despite receiving notice of the DPD's unconstitutional actions, Defendant Denver and DPD deliberately chose not to conduct any further review of the department's less-than-lethal force policy, despite the patently unlawful way in which PepperBall guns had been used against protestors and against the

32

recommendation of the Office of the Independent Monitor, which described the decision not to examine the incident and the underlying policies as a "missed opportunity."

199.    Despite receiving citizen complaints about DPD officers' excessive use of force during protests in the past, Defendant Denver has not disciplined any officer for their behavior at prior protests in at least the last five years.

200.    Defendant Denver's policy, practice, and custom of authorizing officers to use "less-lethal" weapons to control and suppress protests was the moving force behind the violations of Plaintiff's constitutional rights.

201.    These violations are also a direct result of Defendant Denver's use of the services of law enforcement officers from other jurisdictions, who were also authorized to use "less-lethal" weapons to control and suppress protests.

202.    Defendant Denver's policy was to allow the law enforcement officers from outside jurisdictions providing mutual aid to follow their own use of force policies and use their own weapons, even if their own weapons were not approved for use by DPD officers.

203.    The use of force policies of JCRS were "in line with DPD's Use of Force Policy."

204.    The use of force policies of APD were consistent with DPD's use of force policy.

205.    Additionally, Defendant Denver approved and "verified" the use of the "less-lethal" weapons used by JCRS, including beanbag shotguns, Arwen rubber ball grenades, and Stinger grenades.

206.    Defendant Denver and its final policymakers acted with deliberate indifference to the constitutional rights of protestors by authorizing, both explicitly and implicitly, the use of "less-lethal" force against protestors who do not pose any safety threat; by failing to properly train, supervise, and discipline officers regarding the proper use of force against protestors; by failing to rectify the unconstitutional custom of officers using "less-lethal" force to control and suppress demonstrations; and by failing to provide adequate policies. This constituted a conscious choice by Defendant Denver not to properly train, supervise, discipline, rectify, or provide adequate policies on these issues.

207.    Moreover, Defendant Denver is responsible for the actions of any non-DPD officers whose services were used during the protests. By using those services, Defendant Denver was required to ensure that all officers complied with civilians' constitutional rights.

208.    Chief Pazen was fully knowledgeable and apprised of the actions of DPD officers described above and, upon information and belief, was on site on one or more days of the protest, observing this DPD operation, without repudiating or stopping the actions of DPD officers, thereby ratifying them.

209.    DPD operated under the Incident Command System during the protestors. Defendant Phelan was the Incident Commander throughout the protests,

and as such, no action was taken during the protests without being directed or authorized by Phelan

210.   Moreover, on May 29, 2020, Mayor Michael Hancock and Chief Pazen publicly praised DPD officers for their "great restraint" and "tremendous restraint" during protests in Denver and said that the actions of the DPD in the use of "less-lethal" weapons against protestors was proper.

211.   The actions of and use of force by DPD officers and those of mutual-aid officers during the protests were approved by the DPD Internal Affairs Bureau.

212.   The actions of and use of force by DPD officers and those of mutual-aid officers during the protests were deemed by DPD's final policymakers to be consistent with DPD policy, practice, and custom.

213.   Thus, Defendant Denver, through its final policymakers, ratified the conduct of the DPD officers.

214.   This caused the violence and misconduct by DPD officers, including those who shot or gassed or otherwise used force on Plaintiffs, to continue that day and in the days after the Mayor and the Chief of Police made these comments.

215.   Defendant Denver's final policymakers received ample notice that officers were using "less-lethal" force against protestors to control and suppress demonstrations in the absence of any imminent threat to safety, including 150 complaints about the DPD in one 72-hour period, and widely publicized videos and firsthand accounts circulated through the local, state, and international press.

216.    Of the approximately 123 citizen complaints regarding officer use of excessive force during the protests, Defendant Denver disciplined only three officers and fired one probationary officer.

217.    In addition, Defendant Denver's policy at the time of the protests was that officers were not required to complete use of force reports after using "less-lethal" weapons at a protest. During the protests, DPD officers believed that they were not required to complete use of force reports accounting for their use of force against civilians. It was not until *weeks* later, after a lawsuit was filed against the DPD in *Abay v. City and County of Denver*, that the DPD command staff at the highest levels ordered DPD commanders and administrative lieutenants to have their officers complete use of force reports documenting their use of "less-lethal" weapons.

218.    Defendant Denver knew and understood, prior to the protests, that timely and complete use-of-force reporting is essential for officer accountability and transparency, as well as organizational credibility. Defendant Denver's knowledge of this is reflected in the DPD Operations Manual, which sets forth detailed use-of-force reporting requirements during day-to-day policework. Despite this, Defendant Denver inexplicably applied a different policy to protests.

219.    Defendant Denver's failure to require timely use-of-force reporting allowed DPD officers to escape accountability for use of excessive force during the protests. Officers were aware during the protests that they would not have to account for their use of force, and they were not required to write use of force reports

36

or officer statements after the fact until weeks later, when their memories of the events were no longer fresh.

220.   Defendant Denver did not have a written policy that specifically governed the use of body-worn cameras ("BWC") during the protests. In fact, DPD's policy and practice was that officers were not required to activate their BWC during the protests. As a result, many officers did not activate their BWC, including during events when officers used excessive force on protestors, including Plaintiff.

221.   Defendant Denver failed to adequately prepare for the May and June 2020 protests.

222.   Defendant Denver failed to adequately supervise its officers, as observed by DPD Captain Sylvia Sich in her interview with the Office of Independent Monitor after the 2020 protests.

223.   The violations of Plaintiffs' constitutional rights were a direct result of Defendant Denver's unconstitutional policies, practices, or widespread customs.

## Injunctive Relief

224.   Plaintiffs have a reasonable fear of attending protests in Denver in the future due to the cumulative effect of the violence and misconduct by the Defendants. Without intervention by this Court, Plaintiffs, who had participated in and wish to participate or attend protest activities, particularly related to police brutality, are at risk of having their rights violated in the future due to the Defendants' demonstrated pattern of constitutional violations and threatened future actions. Plaintiffs have no adequate remedy at law to protect the future

lawful exercise of their constitutional rights, and, without action by this court, will suffer irreparable injury, thereby entitling them to injunctive and declaratory relief.

225.    Defendants' policies, practices, customs, conduct, and acts alleged herein resulted in, and will continue to result in, irreparable injury to the Plaintiffs, including but not limited to violation of their constitutional and statutory rights. Plaintiffs have no plain, adequate, or complete remedy at law to address the wrongs described herein. Plaintiffs intend in the future to exercise their constitutional rights of freedom of the press, speech, and assembly by engaging in expressive activities in the City and County of Denver. Defendants' conduct described herein created uncertainty with respect to the exercise now and in the future of these constitutional rights, and it has chilled the exercise of these rights.

226.    Specifically, Plaintiffs are concerned that they will be subjected to unreasonable and excessive force by the DPD and/or unreasonable seizures.

227.    Plaintiffs therefore seek injunctive relief from this court to ensure that Plaintiffs and persons similarly situated will not suffer violations of their rights from Defendants' illegal and unconstitutional policies, customs, and practices described herein.[2]

## Count I: 42 U.S.C. § 1983 – First Amendment

228.    Plaintiffs incorporate by reference each of the paragraphs in this Complaint as if restated fully herein.

---

[2] On June 26, 2020, Defendant City and County of Denver and Plaintiffs in this case entered into a stipulation concerning Denver and DPD's use of force on protestors. Dkt. 40. The Court approved the stipulation. Dkt. 41 (Order).

229.   In the manner described more fully above, Defendants violated Plaintiffs' rights under the First Amendment of the United States Constitution.

230.   In the manner described more fully above, Defendants violated Plaintiffs' First Amendment rights when it attempted to control and break up the peaceful protests by using "less-lethal" weapons on Plaintiffs without warning, dispersal orders, adequate time to disperse, or any lawful justification whatsoever. These actions were undertaken in order to discourage, suppress, and retaliate against the exercise of Plaintiffs' First Amendment rights.

231.   Furthermore, the right to gather, receive, record, and disseminate information is grounded in the Free Speech Clause of the First Amendment, as well as the Petition Clause, if the purpose of gathering, receiving, or recording the information is to use it to petition the government for redress of grievances, and the Free Press Clause, if the purpose of gathering, receiving, or recording the information is to publish and disseminate it to other people.

232.   The First Amendment right to gather, receive, record, document, and disseminate information includes the right to photograph, audio and video record police officers performing their duties in public, as well as the right to photograph, audio and video record demonstrations.

233.   Police officers performing their public duties in public places have no reasonable expectation that their conduct is private and will not be recorded, documented, published, and disseminated.

234.    Defendants' actions in using "less-lethal" weapons on individuals recording or documenting police officers performing their public duties in public places violated Plaintiffs' First Amendment rights.

235.    Defendants' actions in using "less-lethal" weapons on Plaintiffs in order to discourage, control, or suppress their speech violated Plaintiffs' First Amendment rights.

236.    The misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant Denver. The policies, practices, and customs of Defendant Denver were the moving force behind the misconduct described in this Count and the violation of Plaintiffs' rights. The policies, practices, and customs of Defendant Denver were the moving force behind the misconduct described in this Count and the violation of Plaintiffs' rights.

237.    Defendant Denver is liable because the violation of Plaintiffs' rights as described in this Count was caused by the policies, practices, or customs of the relevant policymakers for Defendant Denver, or caused by the unconstitutional actions of final policymakers for Defendant Denver.

238.    In the manner described more fully above, the need for policies, training, and supervision of officers on how to handle the use of force on protestors was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of Defendant Denver can reasonably be said to have been deliberately indifferent to the need.

239.    Defendant Phelan was personally involved in or personally directed, controlled, or authorized the actions of subordinate officers which violated the rights of Plaintiffs. Also, Defendant's actions, direction, and control caused the constitutional violations complained of herein; they set in motion a series of events that he knew or reasonably should have known would cause others to deprive Plaintiffs of their constitutional rights. He knew of and acquiesced in the constitutional violations committed by his subordinates. In so doing, Defendant Phelan knowingly created a substantial risk of constitutional injury and disregarded known or obvious consequences of his actions, exhibiting deliberate indifference to the rights of Plaintiffs.

240.    As a direct and proximate result of Defendants' actions, Plaintiffs' constitutional rights were violated, entitling them to relief.

## Count II: 42 U.S.C. § 1983 – Fourth Amendment

241.    Plaintiffs incorporate by reference each of the paragraphs in this Complaint as if restated fully herein.

242.    In the manner described more fully above, Defendants violated Plaintiffs' rights to be free from unreasonable and excessive force under the Fourth Amendment when they used "less-lethal" weapons on Plaintiffs while they presented no threat and without an individualized determination of individual conduct justifying such force, or used such weapons specifically to suppress their expressive activity.

243.    The misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of the Defendant Denver. The policies, practices,

41

and customs of Denver were the moving force behind the misconduct described in this Count and the violation of Plaintiffs' rights.

244.   Defendant Denver is liable because the violation of Plaintiffs' rights as described in this Count was caused by the policies, practices, or customs of the relevant policymakers for Defendant Denver, or caused by the unconstitutional actions of final policymakers for Defendant Denver.

245.   In the manner described more fully above, the need for policies, training, and supervision of officers on how to handle the use of force on protestors was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of Defendant Denver can reasonably be said to have been deliberately indifferent to the need.

246.   Defendant Phelan was personally involved in or personally directed, controlled, or authorized the actions of subordinate officers which violated the rights of Plaintiffs. Also, Defendant's actions, direction, and control caused the constitutional violations complained of herein; they set in motion a series of events that he knew or reasonably should have known would cause others to deprive Plaintiffs of their constitutional rights. He knew of and acquiesced in the constitutional violations committed by his subordinates. In so doing, Defendant Phelan knowingly created a substantial risk of constitutional injury and disregarded known or obvious consequences of his actions, exhibiting deliberate indifference to the rights of Plaintiffs.

247.    As a direct and proximate result of Defendants' actions, Plaintiffs' constitutional rights were violated, entitling them to relief.

### Count III: 42 U.S.C. § 1983 – Fourteenth Amendment

248.    Plaintiffs incorporate by reference each of the paragraphs in this Complaint as if restated fully herein.

249.    In the manner described more fully above, Defendants violated Plaintiffs' rights to due process when they affirmatively and indiscriminately used "less-lethal" weapons and/or kettled Plaintiffs without any lawful justification. Furthermore, this conduct was deliberately indifferent to the Plaintiffs' rights, arbitrary, conscience-shocking, and constituted an abuse or misuse of government power, under the Fourteenth Amendment.

250.    The misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of the Defendant Denver. The policies, practices, and customs of Denver were the moving force behind the misconduct described in this Count and the violation of Plaintiffs' rights.

251.    Defendant Denver is liable because the violation of Plaintiffs' rights as described in this Count was caused by the policies, practices, or customs of the relevant policymakers for Defendant Denver, or caused by the unconstitutional actions of final policymakers for Defendant Denver.

252.    In the manner described more fully above, the need for policies, training, and supervision of officers on how to handle the use of force on protestors was so obvious, and the inadequacy so likely to result in the violation of

43

constitutional rights, that the policymakers of Defendant Denver can reasonably be said to have been deliberately indifferent to the need.

253. Defendant Phelan was personally involved in or personally directed, controlled, or authorized the actions of subordinate officers which violated the rights of Plaintiffs. Also, Defendant's actions, direction, and control caused the constitutional violations complained of herein; they set in motion a series of events that he knew or reasonably should have known would cause others to deprive Plaintiffs of their constitutional rights. He knew of and acquiesced in the constitutional violations committed by his subordinates. In so doing, Defendant Phelan knowingly created a substantial risk of constitutional injury and disregarded known or obvious consequences of his actions, exhibiting deliberate indifference to the rights of Plaintiffs.

254. As a direct and proximate result of Defendants' actions, Plaintiffs' constitutional rights were violated, entitling them to relief.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs Agazi Abay, Amy Schneider, and Gabriel Thorn respectfully request that the Court enter judgment in their favor and against Defendants City and County of Denver, Colorado, Patrick Phelan, awarding as follows:

255. Compensatory damages for Plaintiffs for the violations of their federal constitutional rights, pain and suffering, and other injuries;

256. Punitive damages for Plaintiffs against Defendant Patrick Phelan;

257.    An award of attorneys' fees pursuant to 42 U.S.C. § 1988, and costs;

258.    Pre- and post-judgment interest as permitted by law;

259.    A preliminary and permanent injunction restraining Defendants from engaging in the unlawful and unconstitutional actions detailed above and retaining court jurisdiction to enforce the terms of the injunction;

260.    A declaratory judgment that Defendants' conduct detailed herein was a violation of the rights of Plaintiffs under the United States Constitution;

261.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(c) on all issues so triable.

Respectfully submitted,

s/ Elizabeth Wang

Elizabeth Wang
LOEVY & LOEVY
2060 Broadway, Suite 460
Boulder, CO 80302
O: 720.328.5642
elizabethw@loevy.com

Makeba Rutahindurwa
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
O: 312.243.5900
makeba@loevy.com

*Counsel for Plaintiffs Agazi Abay, Amy Schneider, and Gabriel Thorn*